[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10631

_____

D.C. Docket No. 8:16-cv-02651-VMC-TBM

NANCY KING, et al.,

Plaintiffs - Appellants,

versus

BOARD OF COUNTY COMMISSIONERS, POLK
COUNTY, FLORIDA, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 1, 2019)

Before ED CARNES, Chief Judge, MARTIN, and ROGERS,* Circuit Judges.

ROGERS, Circuit Judge:

_____

* Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Dr. Nancy King worked under contract for Polk County, Florida and for fifteen years was the primary person responsible for determining whether firefighter applicants were medically qualified. In 2014, the medical clearance process for one applicant was mishandled, and King had strong feelings about how the process should have gone and who should have been making clearance decisions. She aired these feelings to her colleagues and, in two private meetings, with a deputy county manager and with the county manager. Subsequently, her contract with the county was put out for bids, and her bid was not selected. King then sued the county and others, alleging that they violated her First Amendment rights by retaliating against her for engaging in protected speech. She did not engage in speech protected by the First Amendment, however, because she spoke as an employee and not as a private citizen.

## I.

As we are reviewing a grant of summary judgment, the following facts are taken from the evidence and read in the light most favorable to King, who is the nonmoving party. *See, e.g.*, *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018); *Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246 (11th Cir. 2015).

In 2014, King was working as the occupational health director for Polk County, Florida. King was first hired as medical director in 2000 under a contract

between her and the county.[1]  Among her various responsibilities, "one of the most important" was to determine whether persons who applied to be firefighters were medically fit for duty.  According to King, her "responsibilities to the county had always been to ensure personnel were medically fit to perform their essential job duties."  Ordinarily, King would rely on a national standard known as NFPA 1582 to determine whether the candidate was capable of performing the tasks of a firefighter, and she would then make a recommendation to the County.

This case revolves around one applicant, "J," who is African-American, and who applied for a position with the Polk County Fire Department under a diversity initiative.  Under this initiative, six promising candidates from socially-disadvantaged backgrounds are provided financial assistance and training to help them apply to be, and ideally become, Polk County firefighters.  Unlike other firefighter applicants who go through fire school and then apply for a position, those hired through the diversity initiative get on the county payroll prior to completing their training.

King did not perform J's initial preemployment screening.  Rather, a physician assistant employed by King performed the exam and found several

---

[1] The plaintiffs in this lawsuit are King and two entities she owned, The Occupational Health Center, Inc. and Work Loss Management, Inc.  These entities provided services to the county as well, but the contract for services was only between King and the county. *See King v. Bd. of Cty. Comm'rs, Polk Cty, Fla.*, 2017 WL 6042022, at \*1 (M.D. Fla, Dec. 6, 2017).

medical problems related to J's lungs, even though J had earlier stated that he did not have any lung problems. The assistant recommended that J see a personal physician to get these issues looked at. This resulted in a misunderstanding: as the physician assistant saw it, J was not medically qualified to become a firefighter; as J saw it, he just needed to get cleared to work by a personal physician. In addition to this misunderstanding, there was a mix-up: even though neither the physician assistant nor King had signed off on J's fitness, J was permitted to begin classroom instruction, which, because he was part of the diversity initiative, meant that he was placed on the county payroll in January 2014.

In the following months, several medical professionals gave conflicting statements about J's medical fitness. Some of these professionals opined that J was medically fit to perform at least some tasks, while those associated with King's office maintained that J was not fit to work as a firefighter. The professionals who cleared J did not use, or were not even aware of, the NFPA standard. King, who ordinarily was the person tasked with making medical fitness recommendations, was not consulted on J's case until late 2014.

King became involved when the then-director of risk management for the county, Mike Kushner, noticed J's case and asked King to review what was going on. In an email that Kushner sent to King, he stressed that King's clinic, Employee Health Services or "EHS," should "never relinquish control of the process" of

4

clearing candidates.  In November 2014, Kushner also asked King to render a medical opinion regarding J's fitness for duty.

Following Director Kushner's request, King called Kandis Baker-Buford, the equal opportunity administrator who oversaw the diversity initiative, to notify her that King would be examining J.  According to King's notes, Baker-Buford responded that it would be "inappropriate" for King to examine J because J had "already received medical clearance from his treating physician."  King was "dumbfounded" because in the fifteen years she had served in this role she had never been refused the opportunity to examine an applicant.

Despite Baker-Buford's request that King not physically examine J, Kushner asked King to review J's medical records and render an opinion.  In his request, Kushner asked King for her "medical opinion as to whether Mr. J completed his physical intake questionnaire accurately."  King was surprised because she had never been "asked to review an applicant's medical records for potentially false information."  King completed her review of J's records in December 2014 and recommended getting a second opinion "given the contentious nature of this case." In her review, King had found multiple inconsistencies and "false information" provided by J in his medical records.  King recommended that J "be evaluated by another Occupational Health physician with an expertise in pulmonary conditions," and Kushner set up an appointment for J to meet with a Dr. McCluskey.  [King Aff.

5

¶ 26.] Baker-Buford was "fine" with the appointment, but was concerned about making J, an African-American diversity initiative applicant, go through more examination than other employees.

In February 2015, County Manager Jim Freeman and Deputy County Manager Lea Ann Thomas became involved. Freeman had been "informed" of J's situation—that he had been a county employee for "over a year," but had "not obtained medical clearance from Dr. King's office," even if he had obtained some clearances from other physicians to perform some tasks. Freeman and Thomas met with Kushner and Baker-Buford in February. Freeman essentially asked Kushner and Baker-Buford to work out their differences regarding how the medical clearance process should work so this confusion would not arise in the future. The heart of the disagreement between Kushner and Baker-Buford was about the role of King and Employee Health Services: Kushner believed King and EHS should always be in control and have the final say on medical clearances, whereas Baker-Buford thought a clearance from a personal physician was sufficient.

King continued to see Baker-Buford as unusually (and unnecessarily) involved in J's case. Baker-Buford had previously rescheduled J's appointment with Dr. McCluskey and questioned whether Dr. McCluskey was a pulmonologist. King stated in her affidavit that she "had never seen this level of involvement and intervention on behalf of any applicant or employee by a county official, including

6

Ms. Baker-Buford."  In March 2015, Dr. McCluskey told King that someone had called McCluskey's office and referred to J as "her client," leading Dr. McCluskey to think that J was represented by counsel in this matter.  After King investigated, she learned that one of Baker-Buford's employees had called Dr. McCluskey.[2] King found this involvement by Baker-Buford's office "unusual."  At one point, Baker-Buford referred in an email to King to some medical documentation; King was "shocked" and "astonished" that Baker-Buford would have such documentation and "circumvent[] the Employee Health Services."  In short, King was upset about the level of Baker-Buford's involvement in J's medical screening.

King requested to speak to County Manager Freeman about her concerns with J and Baker-Buford's involvement, but Freeman directed her to meet with Deputy Manager Thomas.  After several postponements, King met with Thomas at the end of March 2015 to discuss her concerns.  During this meeting King "reported the public safety concerns [she] felt J represented, working as a firefighter without a medical clearance."  J was not working as a firefighter at this time, however, and was still in training.  It is unclear what "public safety concerns" King discussed. King also "advised" Thomas "that other medically unqualified applicants were not hired and [King] felt that the county could face exposure for possible 'reverse'

_____

[2] The employee claimed that she never used the word "client," never represented herself as an attorney, and had in fact only called to let Dr. McCluskey know that J was sick with food poisoning and could not make his appointment as scheduled.

7

discrimination given the favoritism afforded to J and Ms. Baker-Buford's unprecedented involvement in the medical clearance process."

After this meeting, King sent a letter to J's personal physician, who then wrote that J was not medically qualified for firefighter training. King then sent this letter to Diane Mulloney—who worked for Director Kushner—and Mulloney sent it to the fire school. J was then dismissed from fire school in April. After J was dismissed, King's opinion was requested (by a Mr. Cash, presumably a county employee) as to whether J could work as an EMT. King again sought an outside opinion due to the contentious nature of the issue, and ultimately yet another doctor examined J and found that he "should not be working as an EMT." King also believed that J had again lied about his medical history. King sent Kushner and Mulloney a final written determination advising that J "remained medically unqualified for the EMT position" but recommended further testing. After sending this letter, Deputy County Manager Gary Hester contacted King and told her "that under no circumstances" would J be required to undergo more testing. Hester's apparent concern was that more was being required of J than of other applicants. King thought that Hester was "hostile and belligerent." In the end, County Manager Freeman decided to place J in a non-firefighter EMT position.

In September 2015, Freeman and King had a meeting. In King's notes she describes the purpose of the meeting as "discuss[ing] the public safety concerns [she]

8

had regarding Mr. J as well as the oddities of involvement of Diversity Director/HR Director, Kandis Baker Buford." Freeman remembers this meeting as a "debriefing" of the events surrounding J. King remembers telling Freeman that her "number one priority was the safety of not only Mr. J, but also his coworkers as well as the general public." King says that she also brought up the issue of possible "reverse discrimination" lawsuits.[3]

Later that month, in September 2015, Kushner informed King that the county was going to put King's contract out for bids through a Request for Proposals, or "RFP" process. King had served in her role pursuant to three-year contracts which had been renewed without incident since she began working for the county in 2000. The parties dispute why the county put her contract out for bid at this time. The county maintains that a local ordinance required King's contract to be subject to competitive bidding, and that despite past failures to follow this ordinance, the decision to institute the RFP process had been made in 2013, long before the confusion surrounding J began. The county points to a 2013 email to support this version of events. According to King, the ordinance was pretext for the real reason behind this decision: The county did not like what King had to say about J's medical fitness and the clearance process. According to King, when Kushner informed King

---

[3] Freeman does not remember King mentioning "reverse discrimination" liability, but as we are reviewing the grant of summary judgment against King, we make inferences in her favor and assume that she did raise this issue.

9

about the RFP process he told King that "County Management was not happy with how [King] handled the J situation." King later spoke with County Commissioner Ed Smith who told her that "the RFP was put out because the County was embarrassed" about the "whole J situation."

Although King received the highest score out of the submitted bids, the selection committee did not make an official recommendation to the county board to renew King's contract. King waited to see if the selection committee would recommend her to the board, during which time it appeared to King that the county was looking to hire someone else. King had orally agreed to extend her contract during the RFP process but, on March 1, 2016, "needing to give consideration to other business concerns," King notified Mulloney and Freeman that she would stop providing services to the county on March 31.

After King informed Freeman that she would stop providing services, the county's procurement director, Fran McAskill, rejected both RFP proposals. According to McAskill and Freeman, the proposals were officially rejected because after King's abrupt decision to stop providing these services, the county had to move fast and decided to enter into an agreement with a different provider. J ultimately re-enrolled in the firefighter academy, got his medical clearance, and has been working a firefighter since November 2016.

King filed suit against the Board of County Commissioners and various county-related defendants alleging retaliation in violation of her First Amendment rights and violations of Florida state law.  The district court granted summary judgment in the defendants' favor.  *See King v. Bd. of Cty. Comm'rs, Polk Cty., Fla.*, No 8:16-cv-2651-T-33TBM, 2017 WL 6042022 (M.D. Fla., Dec. 6, 2017).  The court determined that King spoke as an employee, rather than a private citizen, for several reasons, including that she did not speak publicly and that her ordinary job duties were the motivation for her speech.  The court reasoned that King was asked to review J's medical documentation, and specifically asked to determine whether J inaccurately reported his medical history, and to render her "medical opinion." 2017 WL 6042022, at *14.  Because "King was asked to review the accuracy of the medical records in her capacity as occupational health director," the court concluded that King's speech was "made in accordance with her ordinary duties of making fitness for duty determinations." *Id.*  The district court also determined that the 2013 email provided by the county foreclosed any dispute as to causation and showed that the decision to initiate the RFP process (the alleged retaliation) was made before the problems with J's medical clearance began.  The Court granted summary judgment for the county defendants on the First Amendment claim and dismissed the state law claims without prejudice.

11

King then moved for reconsideration, arguing that the district court should reconsider its judgment because she had newly discovered evidence. In an affidavit attached to her motion, King explained that after the district court's summary judgment decision, King met Kushner for lunch to discuss the opinion. At this lunch, King asked Kushner about the county's 2013 email showing that the RFP decision predated the problems with J. The email, according to Kushner, was not about King's contract. King then asked Kushner and Mulloney to prepare affidavits stating their understanding of the 2013 email. King submitted these affidavits as well as the 2013 email, and her own affidavit, as "newly discovered evidence" in support of reconsideration. The district court determined that this evidence was reasonably available to King prior to summary judgment and denied her motion for reconsideration.

King now appeals the district court's grant of summary judgment in favor of the county defendants on her First Amendment claim, and the denial of her motion for reconsideration.

## II.

The district court properly granted summary judgment because King spoke in her role as an employee when she expressed concerns with county employees about J's hiring. Her speech was therefore not protected by the First Amendment. King spoke pursuant to her official job duties, the purpose of her speech was work-related,

12

and she never spoke publicly.  When viewed together, these factors paint a clear picture of a person speaking as an employee and not as a private citizen.  *See Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1161 (11th Cir. 2015) (listing relevant factors).  The first step in determining whether a plaintiff has a viable First Amendment retaliation claim is whether the plaintiff's speech "was made as a citizen."  *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015).

It is not entirely clear what speech King asserts to be protected by the First Amendment in her case.  Her briefing appears to focus on the two meetings she had with Deputy Manager Thomas and County Manager Freeman.  As will be explained below, King stresses the importance of her comments about "reverse discrimination" and these meetings appear to be the only times King raised the issue.  However, King also argues that the district court failed to properly sort out the different times King spoke, analogizing her case to, for example, *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988), where we held that the lower court should have considered the various different settings in which the plaintiff spoke.  Furthermore, at oral argument, her counsel argued that beyond King's speech to Thomas and Freeman, her speech to deputy manager Hester as well as her speech to Kushner and Mulloney was protected.  [Oral Arg. at 2:50-3:00.]  We will consider, then, what she said to Thomas, Freeman, Hester, Kushner, and Mulloney.

13

In all of these interactions, King spoke pursuant to her job duties. She was not a concerned citizen who happened to become aware of problems with J and decided to do something about it. "[O]ne of her most important" responsibilities at her job was to determine whether firefighters are medically fit for duty. King Aff. ¶ 3. This job responsibility is precisely how King became involved in this matter. As the district court noted, King only became aware of J's situation because she was "asked to review the accuracy of [J's] medical records in her capacity as occupational health director." *King*, 2017 WL 6042022, at *14. If the speech "owes its existence to a public employee's professional responsibilities," that indicates the speech is not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Here, the starting point of King's speech was her official duties, which suggests she was not speaking as a private citizen.

The Supreme Court's decision in *Garcetti* supports this. In *Garcetti*, a district attorney alleged that he was retaliated against for speaking out about an allegedly faulty warrant, but the Court determined that the district attorney's speech was not protected. "The controlling factor [was] that his expressions were made pursuant to his duties as a calendar deputy." *Garcetti*, 547 U.S. at 421. That is, he only spoke about this issue because his job required him to speak about it. Like the plaintiff in *Garcetti*, the impetus for King's speech was her job-related responsibilities.

It is true that the Supreme Court has cautioned a narrow reading of *Garcetti*, and we have recognized that a plaintiff's speech may deserve First Amendment protection even when it concerns her area of employment. *See Lane v. Franks*, 573 U.S. 228, 236-39 (2014); *Alves*, 804 F.3d at 1162. But King's speech lies at the heart of *Garcetti*. It is, in the words of this court in *Alves*, "speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." 804 F.3d at 1162. For example, King's discussion with Gary Hester arose because Hester contacted King—not the other way around—to express his frustration with King's recommendation that J undergo further testing, a subject squarely in the ken of the county's occupational health director. Her interactions with Kushner were similarly reactionary and work-related. Kushner asked King to review J's medical records and render her opinion, and King responded that she did not think J was medically fit for duty. With Mulloney, too, she only discussed J's fitness, and only in the course of performing her job.

King's meetings with Thomas and Freeman were less "ordinary," in that King may not have ordinarily raised concerns about reverse discrimination or public safety. In considering whether King's speech was part of her "ordinary job duties," however, the question is not "whether the speech itself is made ordinarily or regularly." *Fernandez v. Sch. Bd. of Miami-Dade Cty., Fla.*, 898 F.3d 1324, 1333-

15

34 (11th Cir. 2018), *pet. for cert. docketed*, 18-955 (Jan. 23, 2019). "Rather, we inquire whether the speech falls within an ordinary duty." *Id.* In her meetings with Thomas and Freeman, King spoke about J's medical qualifications, the process for hiring J and other firefighters, potential liability the county might face because of that process, and related concerns. In short, she spoke about precisely the types of things that one would expect given her role with the county.

King makes much of the fact that in addition to comments about J's fitness—plainly a subject at the center of her ordinary job duties—she also spoke about "reverse discrimination" and "public safety," which she contends are distinct topics beyond her ordinary responsibilities. However, these topics were not the main thrust or purpose of her speech. "In reviewing the whole record, [w]e ask whether the main thrust of the speech in question is essentially public in nature or private." *Alves*, 804 F.3d at 1162 (internal quotation marks omitted). The main thrust of King's speech was frustration related to interference with her job duties. That she mentioned, or alluded to, topics such as "reverse discrimination" does not serve to convert her employee speech into a First Amendment-protected complaint. Closer inspection of the substance of King's comments regarding "reverse discrimination" and "public safety" confirms that these topics were not the main thrust of her speech.

Although King made comments about "reverse discrimination," the thrust of her speech was not racism, discrimination, or a potential drain on public funds. King

16

did not complain about actual racism or discrimination. She never accused Freeman, Thomas, Mulloney, Baker-Buford, or anyone else of racism against white firefighter applicants. She "advised" county management that, as a result of the confused process for J's hiring, the county may face liability in the future for "reverse discrimination" because it appeared as though J, an African-American, was treated in a special manner. King stated in her affidavit and that she informed Thomas that the county "could face exposure for possible 'reverse' discrimination given the favoritism afforded to J *and Ms. Baker-Buford's unprecedented involvement in the medical clearance process*." King Aff. ¶ 41 (emphasis added). King's own characterization of the meeting suggests the thrust of her complaint was about the clearance process and Baker-Buford's involvement. Mentioning "possible" liability for perceived wrongdoing in the future does not transform her speech into that of a citizen protesting on behalf of the public.

With respect to her speech about "public safety," King's speech principally concerned the medical clearance process. The record reveals a campaign of concern about the functionality of her office rather than concern about public safety. When King met with Thomas she "reported the public safety concerns [she] felt J represented, working as a firefighter *without medical clearance*." King Aff. ¶ 40 (emphasis added). She did not set forth in her affidavit what public safety concerns she communicated to Thomas *other* than J's lack of a medical clearance. To be

17

clear, this refers to a lack of clearance from *King*; J had been cleared by several medical professionals, just not in accordance with King's standard process or the NFPA standards. This was the crux of the dispute between Baker-Buford and Kushner; Baker-Buford thought the clearances from J's personal physician were sufficient, Kushner did not. The thrust of King's speech was that J, to use King's phrasing, "represented" a public safety threat because proper medical clearance protocols were not followed. The thrust was not imminent concern for public safety posed by J. He was not even serving as a firefighter when King aired her concerns. Similarly, King states that she met with Freeman "to discuss the public safety concerns [she] had regarding J as well as the oddities of Ms. Baker-Buford's involvement in the medical clearance process." *Id.* ¶ 53. Here again, whatever King's "public safety concerns," they were on their face bound up with frustration regarding Baker-Buford and the clearance process.

From the moment King was first asked to review J's medical fitness through the present appeal, King's focus has been on workplace disputes and protocol and not her fear for public safety. Although King painstakingly lays out Baker-Buford's "unusual" actions and the many twists and turns of J's confused clearance process, she only tangentially and broadly describes the threat J poses. This is how she described the meeting with Thomas in her complaint:

> In that conversation, she outlined her concerns and provided Defendant THOMAS with some written documentation to substantiate the

18

multiple oddities with J, along with Defendant BUFORD's unprecedented involvement in his medical clearance. Plaintiff told Defendant THOMAS during this meeting that Plaintiff was concerned about J's ability to safely perform the essential functions of his job, the public safety concerns that could be posed by J if he was a fire fighter, as well as the multiple actions by Defendant BUFORD interfering with the medical clearance of J. Defendant THOMAS was provided with telephone records from Dr. McCluskey on February 5, 2015 through which Dr. McCluskey received a call from BUFORD's office in which the person stated that "my client", i.e., J, would not be attending the appointment scheduled with him the following day.

Second Am. Compl. ¶ 33.  Only the underlined portion touches on "public safety." The rest, including King's comments about "perform[ing] the essential functions of the job," suggest this was a meeting about King's views regarding J's medical fitness and her frustration with Baker-Buford.  Overall, it is clear that King believes J lied to various doctors, and that she believes certain doctors should not have been involved in the qualification process or should have followed the NFPA standard, and it is clear that King believes Baker-Buford interfered with her work, but it remains unclear what J would be unable to do safely as a firefighter.  That lack of clarity is telling, as it shows that King primarily spoke about her job, not about public safety.

Of course the medical clearance process for any firefighter implicates public safety concerns.  King's job is similarly bound up with the county's process for hiring employees and thus may often implicate employment discrimination matters. There is no reason to doubt that King cared about public safety, potential liability

19

facing the county, or discrimination.  This all gives King's speech a sheen of civic-minded purpose.  But upon closer inspection it is evident that, although her speech may have implicated matters the public might care about, King's *perspective* was that of an employee protecting the scope of her job responsibilities.  She spoke out about the medical clearance process in her role as the occupational health director, not about a dangerously unfit firefighter in the role of concerned citizen; about "reverse discrimination liability" as a person who works with the county on hiring issues, not actual reverse discrimination as a citizen concerned about unfair public employment practices.  At bottom, the impetus for her speech was frustration at work, not fear for public safety or the public purse.  If King had complained to Freeman about not having enough paper in her office, or the strength of her internet connection, these complaints would have, in a sense, touched on a matter of public safety—they go to the functionality of her office, and one of her office's primary duties was to assess whether firefighters are capable of doing their jobs.  But these would still be textbook work-related complaints.

Moreover, King never engaged in speech outside of her work.  We generally consider whether the speech "occurred at the workplace," *Moss*, 782 F.3d at 618 (listing factors to consider), and King's speech occurred entirely at work.  In *Morgan v. Ford*, 6 F.3d 750 (11th Cir. 1993), we relied in part on the fact that the plaintiff "in no way dr[ew] the public at large or its concerns into the picture" and concluded

that the plaintiff's speech was not protected.  6 F.3d at 755 (internal quotation marks omitted) (alteration in original).  Like the plaintiff in *Morgan*, King did nothing to communicate with the public.  In fact, she did nothing to communicate with anyone outside of those who would ordinarily be involved with this process.  She raised these issues with the manager of the wellness center, the county risk management director, and the county manager and deputy managers (to the extent *she* raised them at all; she was often simply responding to inquiries from others).  If a person "observ[es] formal workplace hierarchies," that suggests she was speaking as an employee.  *See Fernandez*, 898 F.3d at 1332.  The manner in which King raised her concerns indicates that she was acting more as a frustrated employee than as a citizen concerned about "reverse discrimination" and public safety.

We recognize that King's lack of public dissemination is not alone dispositive; a person may engage in protected speech without necessarily airing her grievance publicly.  *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 415-16 (1979); *Cook v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005).  But that does not mean the in-house nature of her speech is not relevant.  In combination with other aspects of her speech it reinforces that she was an employee discussing employment-related matters, not a private citizen engaging in protected speech.

21

King makes several unavailing arguments as to why she was speaking as a private citizen.  First, King argues that the district court improperly followed *Alves* when determining that King spoke as an employee.  The nature of this purported error is not entirely clear, but whatever her discomfort with *Alves*, we are bound by it.  Furthermore, King's speech is even less fit for First Amendment protection than the unprotected speech in *Alves*.  In that case, a group of psychologists who worked for a University of Georgia clinic wrote and signed a memorandum to the University outlining their problems with a new doctor who had been assigned to run the clinic.  804 F.3d at 1155-56.  Soon after, the psychologists were fired.  *Id.* at 1158.  They alleged First Amendment retaliation, but we held that they spoke as employees and not private citizens.  *Id.* at 1163.  The psychologists had argued primarily that their speech was private speech for three reasons, including that writing the memorandum was not required by "any job duty," and that they directed their comments to persons "well outside their chain of command."  *Alves*, 804 F.3d at 1163.  King's speech, in contrast, was made privately and precisely to the appropriate persons in her chain of command.

King argues that *Carollo v. Boria*, 833 F.3d 1322 (11th Cir. 2016), is more on point and supports her case, and indeed in *Carollo* we held that a public employee spoke as a private citizen when he complained about misconduct by fellow public employees.  833 F.3d at 1330-31.  King worked for the county and complained about

22

what she saw as misconduct by Baker-Buford.    But *Carollo* had important ingredients that King is missing:  evidence that the plaintiff spoke on something beyond his job duties to persons outside his workplace.  [*See* Blue Br. at 63-66.]  The public employee in *Carollo* was a city manager who spoke out against alleged campaign finance law violations by, among others, the mayor, and he did so at public city council meetings and to local and federal authorities.  *See* 833 F.3d at 1326.  We held that enforcing Florida's campaign finance laws was not within the city manager's ordinary job duties.  King's speech on her dissatisfaction with her ability to perform her job, directed to her colleagues in private meetings, is a far cry from a complaint of campaign law violations made publicly and to law enforcement.  In sum, King spoke as an employee, raising an employment-related concern, in an employment setting.    Thus, her speech was not protected under the First Amendment.  King's various arguments to the contrary are not persuasive.

Similarly unavailing is King's argument that the district court erred in denying her motion for reconsideration.  King argues that the district court erred in denying this motion because she had presented the court with newly discovered evidence.  The evidence she refers to, however, was available to her prior to summary judgment.  The evidence presented in her motion was her own affidavit, the affidavits of Kushner and Mulloney—key witnesses whom she had already deposed—and an email thread that the defendants had submitted on summary

23

judgment.  When determining whether evidence was in fact newly discovered such that reconsideration may be warranted, we ask essentially whether the evidence could have been discovered with "reasonable diligence."  *See M.G. v. St. Lucie Cty. Sch. Bd.*, 741 F.3d 1260, 1262 (11th Cir. 2014).  Reasonable diligence would have uncovered Kushner and Mulloney's opinions about a previously available email.  Her late presentation of this evidence did not warrant reconsideration of the court's alternate decision regarding causation.

The judgments of the district court, granting summary judgment and denying reconsideration, are affirmed.