[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13075
Non-Argument Calendar

_____

D.C. Docket No. 5:19-cv-00138-JSM-PRL

GERARD OLBEK,
ASHLEY ROGERS,

Plaintiffs-Appellants,

versus

CITY OF WILDWOOD, FL,
JASON MCHUGH,
Manager, City of Wildwood,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 5, 2021)

Before LAGOA, BRASHER, and ED CARNES, Circuit Judges.

PER CURIAM:

According to Gerard Olbek and Ashley Rogers, there was mold and asbestos in the City of Wildwood Police Department's building where they worked.  Olbek wrote and circulated to the head of Human Resources a memorandum requesting that employees be tested for mold and asbestos exposure.  He also sent a copy to every employee of the police department.  Rogers proofread the memorandum before it was circulated.  Claiming that the memo caused the City to retaliate by constructively discharging them, Olbek and Rogers sued the City and its manager, raising 42 U.S.C. § 1983 claims of First Amendment retaliation as well as violations of the Florida Public Whistle-blower's Act.  The district court granted summary judgment to the defendants.  Olbek and Rogers appeal the judgment against them on their claims against the City, abandoning those against the city manager.

I.

When the Wildwood Police Department building caught fire in October 2018, it sparked a series of events that led to this lawsuit.[1]  There were three people who were primarily involved.  Olbek was the Deputy Chief of Police, the second

---

[1] We view the evidence in the light most favorable to Olbek and Rogers because they lost in the district court.  As a result, what we accept as facts for present purposes may not be the actual facts.  See Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

highest ranking officer in the police department. His job was largely

administrative, and it included "the daily operations of the agency" and attending

any "management type events" that the Chief of Police could not attend. Rogers

was the Captain of Professional Compliance, and his job duties included internal

affairs and the revision of department policy. Jason McHugh was the city

manager.

## A.

The October 2018 fire caused "extensive damage" to the police department's

building, forcing a relocation of its employees. A few days after the fire, McHugh,

Olbek, and a handful of others did a walkthrough of the building. After they exited

and were standing outside in the parking lot, McHugh commented that he wanted

to clean up the building quickly so the employees could return to it. Olbek raised a

concern about mold in the building, but McHugh did not want to discuss it. He

told Olbek: "We are not using the M word and we are not talking about this."

After Olbek reiterated his concern, McHugh again told him, "We are not talking

about this." According to McHugh, he did not want to discuss any mold issues at

the time because a volunteer police officer was with them and they were in public,

and having the public hear the discussion might have raised liability issues for the

City.

Olbek was unsatisfied with what he felt was McHugh's dismissive response to the mold problem. He waited a few weeks for McHugh to come to him to discuss it. When McHugh did not, Olbek decided to take action. He drafted a memorandum, which we'll call the "Mold Memo." Rogers did not help Olbek draft the memo and did not put his name on it, but he did proofread it.

Olbek wrote the memo on official Wildwood Police Department letterhead with his name and Deputy Chief of Police title at the top. He gave it the subject line "Employee health testing." In its entirety, the memo stated:

> Over the past 15 years or so there have been numerous complaints to the city about the mold issues and the air quality leading to congestion, colds, migraines and general employee health issues. The city has bleached mold off of the walls on numerous occasions, we have replaced walls and constantly battled moisture and there was testing and some type of mitigation some time possibly around 2009-2010 however the employees were not provided any information as to the results but air filtration units were purchased after the results.
>
> We just recently moved filing cabinets in September in an office to reveal a wall full of mold which the city later bleached. Recent information confirms bleach does not kill mold on porous surfaces such as drywall, which has been the city's means of mold mitigation. It is my understanding that recent tests have shown the building contains asbestos as well as mildew/mold, my question/request is can you please look into employee exposure testing options for mold and asbestos exposure for all police department personnel as soon as possible.

Before doing anything with the memo, Olbek asked his supervisor, Chief of Police Paul Valentino, for permission to send it directly to the Human Resources Director, Melissa Tuck. Valentino told Olbek that he could do so because Olbek

4

had a direct line of communication to HR.  And on November 13, 2018, Olbek emailed the Mold Memo to HR Director Tuck.  He also sent it to every other police department employee.  He testified he believed that he was authorized to do that because: "I know I have a direct [line of] communication to my employees with the police department.  They are my subordinates."

McHugh, who was about to leave for his wedding and honeymoon when he learned of the Mold Memo, was furious.  Within an hour of the memo being sent, he called Chief Valentino and told him that he wanted to discipline Olbek for insubordination.  Valentino told McHugh that he should not do that because they may have a whistleblower situation.  By the end of the phone call, McHugh had a "lot better demeanor."  But then, according to Valentino, about a week after McHugh returned to work — the honeymoon was over — he told Valentino that he wanted Olbek "gone."

McHugh did not, however, take any disciplinary action against Olbek or give Valentino any instructions to do so.  In fact, up until at least December 4, 2018, McHugh planned to keep Olbek and Rogers in their positions until after Chief Valentino left the police department, which was in January 2019, and to keep them in their positions at least until a new Chief of Police was hired.  That plan was evident because, on December 4, McHugh proposed to City Commissioners an organizational chart that showed a vacancy in the Chief of Police position, Olbek

5

as the Deputy Chief for Administration, and Rogers as the Temporary Deputy Chief for Operations. Under that structure, the Chief of Police's duties would be split between Olbek and Rogers until a new Chief was hired.

In response to the Mold Memo and another similar memo from a different police officer, HR Director Tuck sent three of her own memoranda. Taken together, her memoranda announced, among other things, that: Tuck would be investigating the mold issues and would provide a report to McHugh; the police department evidence locker would be relocated from the old building; entry into the old building "for any other purpose" than moving the evidence locker was "strictly prohibited unless authorized by" Tuck; and all officers were encouraged to get tested at the City's medical clinic for mold and asbestos exposure, with no appointment needed and with the City paying for it.

Sometime in the next few weeks, Olbek and Rogers decided to take further action. Rogers suggested to Olbek that they should take samples of drywall from the old building to have them tested for mold. They thought they should do that because they feared the City would demolish the building or otherwise cover up the mold problem. Olbek told Rogers to take the samples, or, in Olbek's words, he gave the "order" to do so.

And Rogers did as he was ordered. He had Detective Christopher Smalt, a subordinate, remove pieces of drywall for sampling. Smalt did not know that

6

Olbek had told Rogers to remove the drywall, and Smalt was unaware that Olbek knew about the plan. None of them had authorization from HR Director Tuck to enter the old building, which she had strictly forbidden absent authorization from her; nor did they have authorization from anyone else, either. What day Smalt went in and took the samples is not clear.

It is clear, however, when the City found out about it. On December 5, 2018, Assistant City Attorney Joshua Bills, Public Works Director Jeremy Hockenbury, and an inspector went to the old police department building to coordinate the City's plan to test it for mold. To their surprise, they found that pieces of the walls had been cut out. Bills called City Manager McHugh, telling him, "you're not going to believe this . . . someone's cut holes out of the wall and they've completely trashed the building." McHugh then went to see for himself, and he, Bills, and the city attorney Ashley Hunt, went into the building to see what happened.

They exited the building upset about what they had seen and asked a group of officers nearby what had happened. The group, which included Smalt, all denied any knowledge. Chief Valentino also denied having any knowledge of what had happened.

McHugh decided to have an outside party conduct an investigation. He did not want the Wildwood Police Department to do the investigation because he

thought he had lost control of the department based on the group of officers and Chief Valentino all denying knowledge. McHugh believed an investigation was needed because he thought somebody had taken the drywall to set the City up "for a giant lawsuit" and to "hurt the City, [to] get a payday." The outside party that the City asked to conduct the investigation was the Sumter County Sheriff's Department. (Sumter County is the county in which the City of Wildwood is located.)

The investigation was a criminal one, and Hunt instructed Assistant City Attorney Bills to sign an intent to prosecute document. Hunt opted for a criminal investigation because it was easier to convert a criminal investigation into an internal one than the other way around. Because the City did not know who had taken the drywall or why, Hunt wanted to keep the options open. McHugh, for his part, did not want to criminally prosecute anyone but wanted to find out who had done it.

The sheriff's department investigated the drywall removal as a criminal mischief offense, which possibly could have risen to the felony level depending on the value of the drywall taken. The City, as the victim of the crime, told the sheriff's department that the estimated property value was $500; criminal mischief involving that amount is a misdemeanor of the second degree. See Fla. Stat. § 806.13(b)(2). Nobody told the sheriff's department what crime to investigate,

though — any arrest decision would be up to that department, and any prosecution decision would be up to the State Attorney, not to the City, the city attorney, or McHugh.

Neither Rogers nor Olbek returned the investigator's phone calls and voicemails. But an unidentified confidential informant told the investigators that Rogers had personally cut the drywall. That was not entirely accurate. Smalt cut the drywall and took pieces of it at the direction of Rogers.

Smalt, for his part, did not tell the sheriff's department investigators anything, despite their interviewing him. He did, however, talk to City Attorney Hunt. He told Hunt that Rogers had directed him to take the drywall samples; he didn't mention to Hunt any involvement by Olbek because he didn't know that Olbek had any involvement. Smalt also told the City's mayor what happened, but the mayor did not relay the information to Hunt or McHugh.

While the investigation was ongoing, Chief Valentino and McHugh had a series of conversations. Valentino told McHugh that he wanted the sheriff's department's investigation to end. He also told McHugh that he wouldn't "find out who did it if [McHugh was] going to hold these criminal sanctions over somebody." The conversations led to McHugh making a simple offer to Valentino on December 7, 2018: The City would drop the investigation if whoever was responsible for removing the drywall resigned.

During that time, McHugh did not know of Olbek's involvement in the removal of the drywall. Initially, only Rogers knew, and the record does not show that he told anyone. On December 7, however, Olbek told Valentino that he was the one who had instructed Rogers to take the drywall. The record evidence is contradictory as to whether Valentino shared that information with McHugh. Valentino testified that he never told it to McHugh, and further that he never told the sheriff's department about it. McHugh, however, testified in his deposition and swore in an affidavit that Valentino told him about Olbek's involvement — but only after McHugh had told Valentino that the investigation would end if whoever was responsible resigned.

Valentino, knowing Olbek and Rogers were responsible for removing the drywall, relayed to them that McHugh said the City would drop the investigation if the person responsible resigned. Olbek and Rogers both decided to resign. Before the sheriff's department's investigation concluded, they submitted letters of resignation; Rogers on Friday, December 7, 2018, and Olbek on the following Monday, December 10. They resigned to save their accrued vacation and sick leave pay, fearing that they would lose that money if they were arrested. The City promptly notified the sheriff's department that it no longer wanted to pursue any charges or investigation, and the investigation was dropped.

10

B.

Olbek and Rogers sued the City and McHugh claiming First Amendment retaliation and violations of the Florida Public Whistle-blower's Act. The City and McHugh moved for summary judgment, which the district court granted. It noted "[p]reliminarily" that the "alleged retaliation against [Olbek and Rogers] for exercising their right to free speech did not involve [their] speech. Rather, [their] resignations were because of a criminal investigation concerning an unauthorized entry into and the defacement of the police department building."

Even if their resignations were because of their speech, however, the court determined that neither had suffered an adverse employment action because they had voluntarily resigned. In addition, it determined that Olbek did not speak as a citizen on a matter of public concern. And it also determined that not only had Rogers not engaged in any speech, but McHugh did not know Rogers had any involvement with the Mold Memo. On their Whistle-blower's Act claim, the court reiterated that neither of the two had suffered an adverse employment action, and there was no "existing misconduct" by the City for the Mold Memo to have blown a whistle about.

The court layered it on by summarizing that Olbek's and Rogers' "resignations were not because of [their] exercise of free speech, but because of a criminal investigation concerning an unauthorized entry into and defacement of the

11

police department building." And that "[e]ven if the resignations were related to the exercise of free speech," neither spoke as a citizen on a matter of public concern and neither suffered an adverse employment action.

## II.

Olbek and Rogers argue that the district court got it wrong. They insist that the City did retaliate against them for speech that was protected by the First Amendment and that it violated the Whistle-blower's Act.[2] The retaliation that they allege is constructive discharge, which they say was caused by the investigation into who removed the drywall. That investigation, according to them, forced them to involuntarily resign. The speech that they claim was protected by the First Amendment and the Whistle-blower's Act is Olbek's Mold Memo. In other words, their theory is that the investigation into non-speech conduct — the unauthorized damage to and removal of City property — was really caused by and was a pretext for McHugh's secret intent to fire them or force their resignations in retaliation for the Mold Memo.

We review de novo the grant of summary judgment, applying the same legal standards as the district court. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1263 (11th Cir. 2010). "We will affirm if, after construing the evidence in the light most favorable to the non-moving party, we find that no genuine issue of

---

[2] We will refer to the Act by the short title it assigns itself. See Fla. Stat. § 112.3187(1).

12

material fact exists and the moving party is entitled to judgment as a matter of law." Id. at 1263–64. Although we draw justifiable inferences in the non-moving party's favor, "unsupported speculation does not meet a party's burden of producing some defense to a summary judgment motion" because it "does not create a genuine issue of fact." Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (cleaned up). Speculation instead "creates a false issue, the demolition of which is a primary goal of summary judgment." Id. (quotation marks omitted). We can affirm on any basis supported by the record. Big Top Koolers, Inc. v. Circus-Man Snacks, Inc., 528 F.3d 839, 844 (11th Cir. 2008).

A.

To succeed on a First Amendment retaliation claim, a public sector employee plaintiff must show, among other things, that he spoke as a private citizen. Alves v. Bd. of Regents of the Univ. Sys. of Ga., 804 F.3d 1149, 1160 (11th Cir. 2015). If instead of speaking as a citizen he spoke as an employee in furtherance of his ordinary job duties, his speech was not protected by the First Amendment and his claim fails. Id. at 1161–62. Whether the plaintiff spoke as an employee is a "practical" inquiry and a few of the non-dispositive factors that we consider are his "job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." Id. at 1161.

Olbek spoke as an employee.  He "spoke pursuant to [his] official job duties, the purpose of [his] speech was work-related, and [he] never spoke publicly." King v. Bd. of Cnty. Comm'rs, 916 F.3d 1339, 1345 (11th Cir. 2019).  Olbek's job duties included "broad administrative responsibilities," and we've repeatedly held that when "the employee speaks pursuant to those duties, then the speech is not protected by the First Amendment."  Fernandez v. School Bd. of Miami-Dade Cnty., Fla., 898 F.3d 1324, 1334 (11th Cir. 2018).  Olbek wrote the Mold Memo as the Deputy Chief of Police, used official Wildwood Police Department letterhead with his title on it, received approval from his supervisor to send it, emailed the memo from his office during work hours, sent it directly to HR, and in it he requested only that employees be tested.  See id. at 1332 (noting as relevant considerations whether the plaintiff "[spoke] with the objective of advancing official duties," "harness[ed] workplace resources," "project[ed] official authority," "heed[ed] official directives," and "observ[ed] formal workplace hierarchies").  Of the things that usually indicate employee speech, Olbek "checked virtually every relevant box."  Id.

As is clear from Olbek's deposition testimony, his purpose in sending the Mold Memo was to protect the safety of City employees, people he viewed as being his employees and subordinates.  See id. (using the plaintiff's deposition testimony and other statements when determining his ordinary job duties).  For

14

example, in the context of explaining why he sent the Mold Memo to HR, Olbek testified: "First and foremost my concern is my employees." And he said that any of the City's liability issues "don't ever outweigh employee health."[3] Clearly, Olbek's "perspective was that of an employee protecting the scope of [his] job responsibilities" and those he viewed as working with him. King, 916 F.3d at 1349; see also Moss v. City of Pembroke Pines, 782 F.3d 613, 619 (11th Cir. 2015) (holding that plaintiff's testimony "that all of his speech was motivated by his belief that the City's actions would negatively impact the fire department's provision of services" served to "confirm[] that [his] speech was made in furtherance of his self-described responsibilities").

Even if in some attenuated sense Olbek's Mold Memo might have had "a sheen of civic-minded purpose," it was not transformed into citizen speech since the "main thrust or purpose of [the] speech" was work-related. King, 916 F.3d at 1348–49. The main thrust, if not the entire thrust, of the Mold Memo is a simple one: its subject line is "Employee health testing" and the memo requests that employees be tested for mold and asbestos exposure. The background information about mold in the building that is contained in the memo is a prelude to and

---

[3] Olbek downplays these comments as just indicating that his "perceived ethical or moral concerns as a citizen overrode whatever the City might claim were his administrative duties." We have rejected that kind of argument before, and we reject it now. See Fernandez, 898 F.3d at 1334 (citing D'Angelo v. School Bd. of Polk Cnty., 497 F.3d 1203, 1210 (11th Cir. 2007)).

support for the request it contains.  It is a "textbook work-related" request and the "impetus for [it] was frustration at work, not fear for <u>public</u> safety or the public purse."  <u>Id.</u> at 1349 (emphasis added).

Not only that, but Olbek never spoke publicly.  Instead, he sent the memo to the HR Director and to police department employees, not to the media.  To be sure, the media obtained a copy of the memo, but Olbek insists that he had nothing to do with that and does not know how it happened.  <u>See</u> <u>King</u>, 916 F.3d at 1349 ("[The plaintiff] did nothing to communicate with the public.  In fact, she did nothing to communicate with anyone outside of those who would ordinarily be involved with this process.").  That is another relevant factor indicating he spoke as an employee.  <u>See</u> <u>id.</u>

"When viewed together, these factors paint a clear picture of a person speaking as an employee and not as a private citizen."  <u>Id.</u> at 1345.  Even if writing memoranda like the Mold Memo was not something Olbek usually did, frequency is not required.  What counts is that it was done to promote the safety of police department employees whom he viewed as being his employees and subordinates, and it was undoubtedly within his ordinary duties.  <u>See</u> <u>id.</u> at 1333–34 ("[W]e ask not whether the speech itself is made ordinarily and regularly.  Rather, we inquire whether the speech falls within an ordinary duty.").  Olbek's Mold Memo "owes its existence to [his] professional responsibilities, and it cannot reasonably be

divorced from those responsibilities." Alves, 804 F.3d at 1165 (quotation marks and citation omitted). Because he spoke as an employee, Olbek's First Amendment retaliation claim fails and we need not address any other elements of it. See id. at 1166 n.5.

Rogers' claim also fails. The plaintiff generally must show that the employer was actually aware of the protected expression. See Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997). Rogers cannot do so. He has presented no evidence that McHugh or the City knew that he proofread the Mold Memo or that he was in any way involved with it. Indeed, both Rogers and Olbek testified that they had no reason to think McHugh knew of Rogers' involvement. There is no genuine issue of fact about their unawareness of his role.

B.

The Whistle-blower's Act prohibits a municipal government entity from taking an "adverse personnel action" against an employee in retaliation for the employee's disclosure of the municipal entity's misconduct. See Fla. Stat. § 112.3187(3)(c), (4)(a). To succeed on a Whistle-blower's Act claim, one of the elements a plaintiff must show is "a causal relation between" protected activity and the "adverse personnel action." See Griffin v. Deloach, 259 So. 3d 929, 931 (Fla. 5th DCA 2018).

17

The only potential "adverse personnel actions" that Olbek and Rogers can point to are the investigation into who removed the drywall and McHugh saying that the City would drop the investigation if whoever was responsible resigned. According to their argument, those actions taken together were constructive discharge. Even if we assume that theory is valid — which we seriously, seriously doubt — neither plaintiff can create a genuine issue of material fact on causation.

Rogers' claim fails because, as we've discussed, there is no genuine issue of material fact about the City's unawareness about his involvement with the Mold Memo. A fact that is unknown to an actor cannot motivate his action. Simple as that.

Olbek, on the other hand, was known to be the author of the Mold Memo. He put his name and official title at the top of it. Still, there is no genuine issue of material fact that his memo caused the City to force him to leave, as Olbek contends. The record does not support a reasonable inference that City Manager McHugh knew of Olbek's involvement in the removal of the drywall, either at the time of the decision to investigate or at the time that McHugh told Chief Valentino that the City would drop the investigation if whoever was responsible resigned. It would not be reasonable to infer that an investigation into something Olbek was not suspected of doing was intended to retaliate against him for doing it.

18

Although the sheriff's department's investigation had identified Rogers' involvement in the drywall removal, there is no evidence that the investigators had reason to suspect that Olbek had been involved. Even Smalt, who physically took the drywall samples and who told the city attorney and mayor about what happened, did not know about Olbek's involvement. It is true that on December 7, 2018 Olbek privately told Chief of Police Valentino about his involvement. But Valentino testified that he never told McHugh that. Further, McHugh's testimony was that he did not learn Olbek was involved until after he had told Valentino that whoever was responsible could resign. Though McHugh testified that it was Valentino who told him, and Valentino testified that he never told McHugh, any conflict between Valentino's and McHugh's testimony is immaterial because either way it is resolved is consistent with the conclusion that McHugh did not know of Olbek's involvement at the time that resignation was proposed.

Olbek offers only speculation contradicting that conclusion and speculation that the City somehow, some way knew he was involved in the removal of the drywall. Because speculation cannot create a genuine issue of material fact, it cannot defeat summary judgment. See Cordoba, 419 F.3d at 1181.

**AFFIRMED.**

19