[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14319
_____

D.C. Docket No. 1:15-cv-21915-DPG


ALBERTO FERNANDEZ,
HENNY CRISTOBOL,

                                        Plaintiffs - Appellants,

PATRICIA RAMIREZ,

                                        Plaintiff,

versus

THE SCHOOL BOARD OF MIAMI-DADE COUNTY, FLORIDA,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 10, 2018)

Before MARCUS and WILSON, Circuit Judges, and HOWARD,[*] District Judge.

MARCUS, Circuit Judge:

Again today we face the question whether the speech of two public employees of the Miami-Dade County School District is protected by the First Amendment. Whether they spoke as private citizens or public employees and about matters of public concern makes all the difference. Sometimes, answering these questions is difficult, particularly as we remember that "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014). This is not one of those cases.

Dr. Alberto Fernandez and Henny Cristobol (occasionally referred to as "the Administrators") served as the principal and the assistant principal of Neva King Cooper Educational Center, a public school that specialized in educating students with severe physical and intellectual disabilities. Determined to improve the school's instructional quality, Fernandez and Cristobol resolved to convert Neva King into a charter school. They directed staff members to research charter conversion. They held a faculty meeting, where they attempted to mobilize the faculty's support for their initiative. Moreover, with Cristobol's assistance, Fernandez urged Neva King's Educational Excellence School Advisory Council ("the School Advisory Council") to pursue charter conversion. After the School

---

[*] Honorable Marcia Morales Howard, United States District Judge for the Middle District of Florida, sitting by designation.

2

Advisory Council agreed to hold a vote on whether to convert Neva King, Fernandez and Cristobol began arranging the ballot process.

Upon discovering their efforts, the Miami-Dade County School Board launched an investigation and disciplined both of them. Fernandez and Cristobol sued in federal court, alleging that the School Board's response to their conversion efforts abridged their freedom of speech and association in violation of the First Amendment. The district court concluded that their speech was not constitutionally protected because it was uttered pursuant to and as part of their "official duties" as public employees, and, therefore, granted summary judgment to the School Board.

We hold that *D'Angelo v. School Board of Polk County*, 497 F.3d 1203 (11th Cir. 2007), compels the affirmance of the district court's judgment, and that the Supreme Court's most recent opinion in *Lane v. Franks*, 134 S. Ct. 2369 (2014), does not undermine, let alone abrogate *D'Angelo*'s precedential effect. At the end of the day, the Administrators spoke not as private citizens but as the principal and assistant principal of a public school, pursuant to their official duties, when they undertook to convert their public school into a charter school. Under controlling precedent, their speech was not protected by the First Amendment.

3

I.

A.

In the summer of 2011, the principal and assistant principal of Neva King became interested in converting their school into a charter school under Florida law. The principal, Dr. Fernandez, explained that a conversion to a charter school would yield "better programs and services to our students," it would increase funding from the state and federal government, and "perhaps get the private sector involved" in the affairs of the school. Accordingly, Fernandez directed staff members, including Cristobol, to learn more about charter conversion. The Administrators devoted substantial time and effort to their pursuit, conducting research, drafting budget proposals, and currying support among community members.

On February 2, 2012, Fernandez addressed a meeting of Neva King's Educational Excellence School Advisory Council -- a body consisting of interested community members, including parents, teachers, students, administrators, support staff, and business leaders, and devoted to improving the school's educational performance. *See* Fla. Stat. § 1001.452. Fernandez recommended that the School Advisory Council vote to apply for charter conversion. The Advisory Council agreed, and submitted an official request to the principal to conduct a conversion vote. Also on February 2, 2012, Fernandez held a meeting with the faculty and

4

delivered a PowerPoint presentation in support of charter conversion. He invited attorney Robin Gibson to address the faculty and answer their questions. Fernandez and Cristobol then scheduled a date to take a vote of the school's parents and teachers. After convening the School Advisory Council and the faculty, Fernandez notified his superiors on the School Board of his intention to conduct a charter conversion vote. In response, the School Board dispatched personnel to Neva King to monitor all meetings where conversion was discussed and to prevent the principal from directly addressing the parents.

The conversion attempt quickly unraveled. On April 4, 2012, the School Advisory Council sent another letter to Fernandez, this time notifying him that "[e]ffective immediately, we are rescinding our request to apply for possible conversion to charter status." And on April 20, 2012, the School Board informed Fernandez and Cristobol that they were under investigation by the School District's Civilian Investigative Unit based on allegations that they had exploited their official positions to influence the vote, and that they had inappropriately devoted school time and resources to these efforts. The School Board placed them on alternative assignments during the pendency of the investigations, and warned them that they were forbidden to "contact, visit, or engage in any type of communication with staff, parents, or community members from" the school or to "contact or engage in any type of communications with the subject of, or

5

witness[es]" to the investigations. Fernandez and Cristobol's reassignments consisted of tedious tasks for which they were overqualified.

Not surprisingly, the investigations revealed that the Administrators had met regularly with faculty and staff during school hours to discuss charter conversion. The investigative reports, released on June 22 and July 13, 2012, found probable cause to believe that Fernandez and Cristobol violated School Board policies relating to ethical standards, staff interactions, internet use and safety, and staff email use. The reports also included several statements from School District officials representing that, in attempting to convert Neva King to a charter school, the Administrators exceeded their official duties. The School Board reviewed the probable cause findings and informed Fernandez and Cristobol that they were subject to discipline.

## B.

During the course of the investigations, Fernandez and Cristobol initiated an administrative proceeding against the School Board with the Florida Department of Administrative Hearings under Florida Statutes Section 1002.33(4)(a)(1). They claimed that the reassignments and "gag orders" -- the prohibitions on interacting with potential witnesses during the investigations -- amounted to unlawful reprisal. *See* Fla. Stat. § 1002.33(4)(a) (prohibiting "unlawful reprisal," defined as "an action taken by a district school board or a school system employee against an

6

employee who is directly or indirectly involved in a lawful application to establish a charter school, which occurs as a direct result of that involvement, and which results in [adverse employment action]"). A final hearing was held in early 2014, after which a state administrative law judge concluded that the School Board committed an unlawful reprisal against Fernandez and Cristobol. The judge also specifically found that, in advocating charter conversion, the Administrators acted pursuant to their official duties. He observed that the Florida Statutes obligate the principal to arrange the vote on charter conversion, and that, when Fernandez and Cristobol did so, they necessarily acted in their official capacities.

The Florida Department of Education adopted the administrative law judge's recommendation in a final order dated November 6, 2014. The Department awarded Fernandez out-of-pocket expenses and lost employment bonuses totaling $10,590. However, the Administrators were not reinstated to their former positions. Thereafter, Fernandez accepted a new position within the School District as Exceptional Education principal assigned to the Special Education Outreach program at Ruth Owens Kruze Educational Center. Cristobol voluntarily left the School District to become the principal of Villa Lyan Academy, a charter school.

In May 2015, Fernandez and Cristobol sued the School Board in the United States District Court for the Southern District of Florida. They brought a single claim under 42 U.S.C. § 1983 alleging that the School Board infringed their rights

to freedom of speech and association by subjecting them to adverse employment action. They sought compensatory damages, including lost wages, and reinstatement to their former positions, among other relief. Following discovery, the School Board moved for summary judgment.

The School Board's central argument was that the Administrators' pursuit of charter conversion and their concomitant speech fell squarely within their official duties. As a consequence, they spoke not as private citizens, but rather as public employees, insulating their speech from the protection of the First Amendment. The district court agreed. In attempting to convert the public school, the Administrators spoke at their workplace, during working hours, and with the aid of school resources. Their speech was covered by their formal job descriptions. And insofar as some School District officials made various statements that Fernandez and Cristobol's conversion efforts were not part of their official responsibilities, the court found that evidence to be immaterial, since the status of their speech was a legal question for the court, not for School District officials, to decide. Because Fernandez and Cristobol plainly spoke in the course of their official duties, their speech did not enjoy First Amendment protection, and the School Board was entitled to summary judgment.

The Administrators filed this timely appeal in our Court.

8

II.

We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). Summary judgment is appropriate when the record evidence shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Id*. The only issue we address today is whether the district court properly concluded that the Administrators' speech was not protected by the First Amendment. We hold that it did.

A.

To determine whether a public employee may invoke the safeguards of the First Amendment, we begin by asking whether the employee spoke as a public employee pursuant to his official duties or as a private citizen on matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the employee spoke pursuant to his official duties, then he is denied protection under the First Amendment, thereby ending the inquiry. *Id*. If, however, he spoke as a private citizen on matters of public concern, the question becomes "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. at 418. In that event, the Supreme Court has instructed us in *Pickering v. Board of Education*, 391 U.S.

9

563 (1968), and its progeny that we must balance the employee's interest in speaking freely and openly about matters of public concern against the State's interest "as an employer in promoting the efficiency of the public services it performs through its employees." *Id*. at 568. The question, then, boils down to whether the principal and assistant principal spoke pursuant to their official duties when they spearheaded a charter conversion effort for their school.

We addressed a nearly identical question in *D'Angelo v. School Board of Polk County*, 497 F.3d 1203 (11th Cir. 2007). There, Michael D'Angelo, the principal of Kathleen High School, explored converting his school into a charter school under Florida law. *Id*. at 1206. As principal, his job description included the obligation to "provide leadership for and implement school improvement initiatives." *Id*. at 1207. During his charter conversion effort, D'Angelo attended a seminar on charter schools, held staff meetings, and directed faculty members to study charter schools. *Id*. at 1206. He also wrote to his assistant principal that, "with the charter opportunities granted by the State of Florida, he would be remiss in his duties as the leader of Kathleen High School if he did not explore any and all possibilities to improve the quality of education at the school." *Id*. His initiative ultimately foundered and the school district terminated him. *Id*. at 1207. He responded by filing a First Amendment retaliation claim in federal court. *Id*. During trial, the district judge ruled for the School Board after the close of

D'Angelo's case in chief, entering judgment as a matter of law. *Id*. The court held that, under *Garcetti*, D'Angelo's speech was not protected by the First Amendment. *Id.*

On appeal, we applied *Garcetti* and assessed whether D'Angelo sought charter conversion pursuant to his official duties as the principal of Kathleen High. *Id*. at 1210. Our decision hinged on two essential considerations. First, we looked to the Florida Statutes' description of charter conversion and observed that "[a]n application for a conversion charter school shall be made by the district school board, the principal, teachers, parents, and/or the school advisory council." *Id*. (quoting Fla. Stat. § 1002.33(3)(b)) (emphasis added). "Because there [was] no evidence that D'Angelo was a parent or a teacher, his efforts to convert Kathleen High to charter status necessarily were in his capacity as the principal of the school." *Id*. Second, we relied on D'Angelo's admissions at trial. *Id*. Although he testified that charter conversion was not one of his assigned duties, he conceded that he explored charter conversion pursuant to his "number one duty," which was to "improve the quality of education" at Kathleen High. *Id*. Since Florida law clarified that D'Angelo administered the conversion effort pursuant to his official duties, and because D'Angelo effectively admitted as much at trial, we concluded that his speech was not protected by the First Amendment and affirmed judgment for the school board. *Id*.

11

The factual matrix presented by *D'Angelo* is on all fours with this case. For starters, Dr. Fernandez's job description provided that he was responsible for "providing effective education leadership" by "developing and implementing plans that effectively utilize the personnel and material resources necessary to produce a quality instructional program." Similarly, Assistant Principal Cristobol's occupational summary listed among his official duties "[a]ssist[ing] the principal in planning and administering the instructional program and in conducting other activities necessary to provide quality instruction."

Moreover, both Florida law and Fernandez's statements fully support the determination that he and Cristobol advocated charter conversion pursuant to their official duties. Florida law establishes the process for effecting the conversion of a public school to a charter school. Among other things, it enumerates who may apply for charter conversion, expressly including the principal. Fla. Stat. § 1002.33. Again, the statute provides: "An application for a conversion charter school shall be made by the district school board, the principal, teachers, parents, and/or the school advisory council." *Id*. Just as in *D'Angelo*, Principal Fernandez and Assistant Principal Cristobol held numerous staff meetings, spoke to many key players including the school faculty, and arranged for a vote on charter conversion. And, just as in *D'Angelo*, the Administrators did not claim to have launched their conversion effort as teachers or parents. *See D'Angelo*, 497 F.3d at 1210. Plainly,

their "efforts to convert [Neva King] to charter status necessarily were in [their] capacit[ies] as the principal [and assistant principal] of the school." *Id.*

Moreover, Florida regulations likewise provide that, in order to initiate the ballot process for charter conversion, "[a] district school board, the principal, teachers, parents, and/or the school advisory council at an existing school . . . may submit a request in writing to the school administrator to conduct a vote for conversion. . . . The administrator shall initiate the ballot process within sixty (60) days of the written request . . . ." Fla. Admin. Rule 6A-6.0787. In order to conduct a vote on a charter conversion, an official request must be sent to the principal who, in turn, is responsible for initiating the ballot process. Here, it is undisputed that the Educational Excellence School Advisory Council sent Dr. Fernandez an official request to conduct a charter conversion vote. Fernandez then scheduled a vote. Under Florida law, Fernandez and Cristobol necessarily acted as "administrator[s]," and not as private citizens, when they received the School Advisory Council's official request and began arranging the vote.

We add that, during the state administrative hearing, the administrative law judge found that Fernandez and Cristobol's pursuit of charter conversion fell squarely within their official duties. Indeed, he concluded that the School Board's actions were "plainly at odds with" Florida regulations, which "obligate[d]" the principal to oversee the charter conversion ballot process. He observed that "no

13

reasonable person would expect" those duties to be executed in a private capacity. The Florida Department of Education adopted that finding wholesale.

Further, Miami-Dade County Public Schools Policy 9150, entitled "Visitors Invited by Other Administrators," provides that "[s]upervisory or administrative staff who have invited professional visitors may elect to receive the visitors whom they have invited, as well as other visitors who may have a mutual interest or area of competency." At the February 2, 2012 faculty meeting, Fernandez and Cristobol, again in the exercise of their official duties, invited attorney Robin Gibson to speak about charter conversion. Thus, on top of Florida's statutory and regulatory regime, Miami-Dade School District policy suggests that the Administrators spoke as public officials acting pursuant to their official duties when they advocated charter conversion.

Also, just as in *D'Angelo*, Fernandez and Cristobol effectively conceded that they sought charter conversion pursuant to their official duties. Thus, for example, on February 2, 2012, Margaret Getchell, the School Advisory Council's Chairperson, sent a letter to Fernandez accepting his recommendation and requesting a conversion vote. The letter read this way: "On behalf of the Educational Excellence School Advisory Council, please accept this letter as an official request to conduct a vote to submit an application to convert Neva King Cooper Educational Center to a charter school . . . " (emphasis added). When asked

14

about the Advisory Council's "official request" at the state administrative hearing, Fernandez replied, "Yes. This is a letter that I drafted for Ms. Getchell after I recommended to the [Advisory Council] to consider conducting a vote to submit an application for conversion charter. And the [Advisory Council] voted unanimously in favor of it. And the next step was for me, as the principal, to receive the request in writing to conduct the vote, and this is such request" (emphasis added).

The principal's efforts did not end there; nor did his description of those efforts. On February 10, 2012, Fernandez sent a memorandum to Associate Superintendent Milagros R. Fornell responding to Fornell's warnings that Fernandez's conversion efforts threatened to violate the School Board's ethical standards. Fernandez replied that he had reviewed the standards and, "[a]ccording to Florida Statutes, the official duties of a principal can include an application for charter status." As principal, he was "by law allowed to make" every effort to convert Neva King to a charter school.

Indeed, in a section of their amended complaint entitled "The Principal's Role in a Charter School Conversion," the plaintiffs averred that Fernandez exercised his statutory authority under Florida law when he pursued charter conversion. Specifically, they alleged, after the School Advisory Council agreed to hold a vote, Fernandez was "vested exclusively" with the responsibility to initiate

15

the balloting within sixty days of the Advisory Council's request; ensure that only eligible voters participated; appoint an arbitrator to tally the votes; and complete the vote at least thirty days before the charter application deadline. In fact, they claimed that the School Board "asserted itself to dominate the [charter conversion] process and usurp the authority granted by Florida law to the principal." Thus, in their own complaint, the Administrators characterized their receipt of the Advisory Council's request and their initiation of the ballot process as "The Principal's Role in a Charter School Conversion."

> Finally, at Fernandez's deposition, the following exchange took place:
>
> Q. Now, in your capacity as the principal, around the fall of 2011, you met with Mrs. Ramirez and Mr. Cristobol and you asked them to research what would be necessary to convert Neva King Cooper into a charter school; true?
>
> [Fernandez]. I was the principal at Neva King Cooper, and at the time that I asked them to look into the feasibility or exploring the idea, yes.

Despite some equivocation, Fernandez was asked whether, in his capacity as principal, he met with Cristobol and directed him to research charter conversion; Fernandez acknowledged that he did. Likewise, when asked about attorney Gibson's visit, Fernandez was asked:

> Q. [Gibson] couldn't come unless you allowed him to come on school grounds?
>
> [Fernandez]. Of course.

Fernandez conceded that, in inviting and receiving Gibson at the February 2012 faculty meeting, he exercised his official authority pursuant to Miami-Dade County Public Schools Policy 9150 and Florida's statutory regime.

In short, the application of Florida law and the Administrators' statements in this case yields the same result as in *D'Angelo*. What's more, this result is wholly consistent with all of our *Pickering* caselaw, including *Abdur-Rahman v. Walker*, 567 F.3d 1278 (11th Cir. 2009); *Alves v. Board of Regents*, 804 F.3d 1149 (11th Cir. 2015); and *Moss v. City of Pembroke Pines*, 782 F.3d 613 (11th Cir. 2015). Our cases have identified, among others, these considerations as relevant in determining whether a public employee spoke pursuant to his official duties: (1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies. *See Abdur-Rahman*, 567 F.3d at 1280, 1283–84; *Alves*, 804 F.3d at 1161, 1164–65; *Moss*, 782 F.3d at 618–20. Dr. Fernandez and Assistant Principal Cristobol checked virtually every relevant box.

B.

Fernandez and Cristobol advance several objections. None are persuasive. First, they claim that *Lane v. Franks*, 134 S. Ct. 2369 (2014), narrowed the construction of "official duties" set forth in *Garcetti*, and that the application of *Lane* should yield a different result today. There, a public employee, Edward Lane,

17

was fired after testifying under oath before a grand jury and twice at a criminal trial pursuant to subpoena. *Id.* at 2375. It was undisputed that Lane's testimony was not given pursuant to his official duties. *Id.* at 2378 n.4. The Supreme Court held that the First Amendment protected Lane's speech because "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment." *Id.* at 2378. *Lane* thus clarified that *Garcetti* divests speech of First Amendment protection when it is uttered pursuant to a public employee's official duties -- not just if it merely concerns or relates to those duties. *Id.* at 2379. Fernandez and Cristobol cite *Lane*, suggesting somehow that they did not seek charter conversion pursuant to their official duties; rather their efforts only concerned or related to their duties.

But *Lane* was a wholly different case. There, Edward Lane spoke pursuant to an independent duty, binding all private citizens, to testify truthfully in judicial proceedings. *Id.* at 2379. The fact that Lane's testimony concerned information acquired in his official capacity did not change the source of his obligation to testify. *Id.* In sharp contrast, under Florida law, only a parent, a teacher, or a principal may trigger the charter conversion process. A private citizen cannot. Nor can a private citizen oversee the ballot process designed to effect the conversion.

18

Florida law expressly delegates the tasks of overseeing the charter conversion ballot process to the principal. When Dr. Fernandez and Assistant Principal Cristobol attempted to convert Neva King Cooper Educational Center into a charter school, and sought to arrange a vote, they invoked their official prerogatives under Florida law.

Moreover, since *Lane* was decided, our cases have continued to cite and give effect to *D'Angelo*'s holding. Thus, for example, *Alves* presented the question whether a memorandum composed by university employees documenting their superior's poor leadership constituted public-employee speech beyond the protection of the First Amendment. 804 F.3d at 1153. A panel of this Court held that, because the employees drafted the memorandum in order to correct conduct that interfered with their official duties, they penned it pursuant to those duties. *Id.* at 1164–65. We relied almost exclusively on pre-*Lane* precedent, including *D'Angelo*. *Id.* We observed that *Lane* did not create "a substantial shift in the law" but rather, if anything, offered "a slight modification and a useful clarification." *Id.* at 1163. Similarly, in *Moss*, we addressed whether an Assistant Fire Chief for the Pembroke Pines Fire Department spoke pursuant to his official duties when he criticized the Department's collective bargaining strategy. 782 F.3d at 616–17. We held that he did and again compared the case to *D'Angelo*. *Id.* at 620 (citing

19

*D'Angelo*, 497 F.3d at 1210). We labeled our inquiry "*Garcetti Analysis*" and relied almost entirely on pre-*Lane* caselaw. *Id.* at 620–21.

*Alves* and *Moss* instruct us that, while *Lane* explicated some of the boundaries of *Garcetti* and its progeny, it did not disrupt our pre-*Lane* precedent, let alone unclench *D'Angelo*'s grip on this case. *Lane* cannot save Fernandez and Cristobol from summary judgment.

The Administrators further urge that they did not speak pursuant to their official duties because charter conversion was not among their "ordinary" responsibilities. In *Garcetti*, the Supreme Court framed the relevant question as being whether the speech was uttered "pursuant to the employee's official duties." 547 U.S. at 413. In *Lane*, the Supreme Court modified the phrasing slightly, although not the substance of the question, and asked whether the employee spoke pursuant to his "ordinary job duties." 134 S. Ct. at 2378. Fernandez and Cristobol lean heavily on the extensive use of the phrase "ordinary job duties" and argue that "neither Fernandez nor Cristobol, during their many prior years of employment with the District, had ever initiated charter school discussions [before fall 2011]." Their argument misses the mark. In order to determine whether speech is uttered as a private citizen or as a public employee, we ask not whether the speech itself is made ordinarily and regularly. Rather, we inquire whether the speech falls within an ordinary duty. It is entirely consistent with *Lane* to conclude that Fernandez and

20

Cristobol spoke pursuant to their ordinary duties even though they had never before attempted a charter conversion.

To illustrate the point, in *Alves*, the Court explained that "[w]hile the memorandum does not bear the hallmarks of daily activity," it was drafted "in the course of performing -- or, more accurately, in the course of <u>trying</u> to perform -- their ordinary roles as coordinators, psychologists, committee members, and supervisors," and could not "reasonably be divorced from those responsibilities." 804 F.3d at 1164–65. We did not read *Lane* as requiring that the speech itself was made frequently. The employees spoke pursuant to their ordinary duties because they wrote the memorandum "in the course of performing [their] jobs." *Id*. Our caselaw compels the conclusion that Fernandez and Cristobol pursued charter conversion in their official capacities as well. They too spoke pursuant to their ordinary duties even though they had initiated a charter conversion on only one occasion.

Fernandez and Cristobol also claim that the duty of exercising "leadership" over Neva King cannot be characterized as "ordinary" because the term "leadership" is too amorphous and too closely related to advocacy and other bedrock First Amendment activity. That argument is foreclosed by *D'Angelo* as well. We held that D'Angelo spoke pursuant to his official duties in part because he sought a charter conversion in order to improve the quality of education at

Kathleen High, which was part of his official duties; indeed it was an obligation he described as his "number one duty." *D'Angelo*, 497 F.3d at 1210. D'Angelo claimed that those statements were related to his "moral obligations as a human being" and not to his professional responsibilities. *Id*. We rejected the argument, holding that "[a]ny reasonable reader of [D'Angelo's emails and statements] would understand that D'Angelo believed he was obliged to carry out his duties as the leader of Kathleen High and pursue charter conversion." *Id*.

And in *Alves*, we defined the scope of the university employees' ordinary duties as fulfilling their "roles as coordinators, psychologists, committee members, and supervisors." 804 F.3d at 1164. We compared the case to *D'Angelo*, where D'Angelo's "broad administrative responsibilities" rendered his speech unprotected. *Id*. at 1165. The phrase "broad administrative responsibilities" was neither nebulous nor unclear. We reaffirmed *D'Angelo*'s holding that, when a public employee's duties include "broad administrative responsibilities," and the employee speaks pursuant to those duties, then the speech is not protected by the First Amendment. *Id*.; *see also Moss*, 782 F.3d at 618–19 (holding that Moss's speech was insulated from First Amendment protection because it fell within his official duty to "ensure that the fire department provided the best service possible").

22

The long and short of it is that the principal and assistant principal of Neva King Cooper Educational Center spearheaded this charter school conversion pursuant to their official duties. They may not sue the School Board under the First Amendment. We affirm.

**AFFIRMED**