[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10132

Non-Argument Calendar

_____

SCOTT MILLSPAUGH,

Plaintiff-Appellant,

*versus*

COBB COUNTY FIRE AND
EMERGENCY SERVICES,

Defendant,

RANDY CRIDER,
KEVIN GROSS,
in their individual capacities,

COBB COUNTY, GEORGIA,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-03314-WMR

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Scott Millspaugh appeals the district court's order granting summary judgment for Cobb County, Georgia (the "County"); Cobb County Director of Public Safety, Randy Crider, in his individual capacity; and Deputy Chief of Fire and Emergency Services, Kevin Gross, in his individual capacity (collectively "the Defendants"), in his suit alleging First Amendment retaliation under 42 U.S.C. § 1983. He argues that the district court erred in granting summary judgment for the Defendants because (1) he spoke as a citizen when leaving a voicemail with Cobb County Commissioner Keli Gambrill, and (2) Crider and Gross ("the Individual Defendants") were not entitled to qualified immunity. After careful consideration, we hold that Millspaugh spoke as a public employee

when leaving his voicemail and that his voicemail was not protected by the First Amendment.  We also hold that the Individual Defendants were entitled to qualified immunity.  We, therefore, affirm the district court's order granting summary judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On August 20, 2020, Millspaugh filed an amended complaint alleging that his First Amendment rights were violated under 42 U.S.C. § 1983.  In the amended complaint, he alleged that he was a former firefighter for the Cobb County Fire Department ("the Department") and that he was demoted after leaving a voicemail with Gambrill's office regarding five non-operational firetrucks in Political District One ("the District"), which Gambrill represented.

According to Millspaugh, he was a Firefighter III, who assisted with the scheduling of staff in Battalion Four.  He regularly discussed staffing with his Battalion Chief, John Graham, as part of his job duties.  Millspaugh sometimes received notifications from other firefighters regarding their use of leave, and Millspaugh was responsible for finding another firefighter to fill their scheduled shifts.  He also helped call firefighters to work overtime if they were needed to cover a shift.  Millspaugh was required to notify Graham of any staffing shortages within Battalion Four.  In turn, Graham reported to Fire Department District One Chief, Scott White.  White reported to the Deputy Chief of Response, Kevin Gross, who reported to the Fire Chief, Randy Crider.

On the morning of May 2, 2019, Millspaugh left a voicemail with Gambrill's assistant, Ryan Williams.  In the voicemail, he stated, "[h]ey, Ryan, this is Scott. . . .  I was wanting to know if you guys knew why there was five fire trucks not operational today in [Political] District One.  Thank you very much."  Millspaugh was at the fire station, in uniform, and on duty when he left the voicemail.  He left the voicemail in hopes of scheduling a meeting to discuss staffing issues in more detail.  Millspaugh did not get a call back from Gambrill's office.  This instance was the first time Millspaugh called Gambrill's office.

According to Millspaugh, he became concerned after reviewing the Department's status board, which showed the non-operational status of various fire-related vehicles.  Ordinary citizens of the District did not have real time access to the information on the status board.  A screenshot of the status board from May 2, 2019, reflected that six fire vehicles within District were out of service.  On the day he called Gambrill's office, Millspaugh did not raise his staffing concerns with anybody in his chain of command at the Department.  Prior to leaving the voicemail, Millspaugh did not tell any manager or supervisor of the Department that he intended to contact Gambrill's office.

Rather than responding to Millspaugh, Gambrill's office contacted Crider to confirm that the fire-related vehicles were not operational.  Shortly after, Crider called Millspaugh to discuss the voicemail.  Later in the day, Graham ordered Millspaugh to go to

the headquarters to discuss the voicemail. At some point on or after May 2, 2019, Millspaugh told Graham that he called Gambrill's office because of inadequate staffing. At the headquarters, Millspaugh met in Crider's office with Crider, Gross, White, and Graham. On July 19, 2019, Millspaugh again met with Crider, Gross, White, and Graham. At that meeting, Millspaugh was notified that he was being demoted from Firefighter III to Firefighter II. He was told that he was being disciplined for making poor decisions, violating the chain of command, and making inaccurate or misleading statements in his voicemail to Gambrill's office. The demotion resulted in a ten percent reduction in Millspaugh's pay. Millspaugh's annual performance evaluation was changed from exceeds expectations to meets expectations because of his voicemail to Gambrill. The reduction of his performance evaluation negatively affected the percentage of pay raise for which he was eligible the following year.

In the amended complaint, Millspaugh asserted a First Amendment retaliation claim under § 1983, arguing that his voicemail was speech protected by the First Amendment and a motivating factor in the Defendants' retaliatory adverse employment actions. Millspaugh also stated a claim under Georgia's whistleblower law, but he does not raise that claim on appeal.

The Defendants moved for summary judgment, arguing that Millspaugh's First Amendment claim failed because he was on duty and acting as an employee when he conveyed his concerns

about staffing to Gambrill's office. The Defendants argued that because his speech fell within his ordinary duty of securing staffing, he spoke as an employee, and his speech was not protected by the First Amendment. The Defendants also argued that even if he spoke as a citizen, the County had a stronger interest in promoting the efficiency of public fire suppression services than Millspaugh had in the speech. They argued that their expert witnesses, Gordon Henderson and Tim Milligan, testified that a firefighter should only circumvent the chain of command in a life-threatening situation and that breaking the chain of command impacts the level of trust between firefighters and their supervisors. The Defendants also argued that the Individual Defendants were entitled to qualified immunity because they acted within the scope of their discretionary authority when the allegedly wrongful act occurred. Lastly, the Defendants argued that the Individual Defendants did not violate a clearly established constitutional right.

In support of their motion for summary judgment, the Defendants attached several transcripts, including the transcript from Millspaugh's deposition. Responding to questions from the Defendants' attorneys, Millspaugh testified that a fire department is a work environment that relies particularly on trust between employees in emergency situations. Millspaugh also testified that he understood that, on May 2, 2019, he had the duty to notify his supervisors of urgent matters by following the chain of command. Millspaugh further testified the Department was a paramilitary or-

ganization that operated under a rank system. The chain of command established a route of communication from the lowest ranked firefighter up to the Fire Chief. He conceded that a break in the chain of command could cause communication-related problems.

The Defendants also attached Crider's deposition. Crider testified that Millspaugh was demoted from Firefighter III to Firefighter II because of the voicemail. Crider told Millspaugh that leaving the voicemail with Gambrill's office was a violation of trust. Crider also testified that shortly after Millspaugh left the voicemail with Gambrill's office, Millspaugh stated that he left the voicemail because he was concerned about staffing in the District and the safety of people that lived in the District due to inadequate coverage. Crider testified that Millspaugh's voicemail disrupted the Department's operations because he and Graham had to take the time to meet with Millspaugh and decide whether it was appropriate to discipline Millspaugh for the voicemail.

The Defendants additionally attached Gross's deposition. According to Gross, he oversaw the day-to-day operation of all firefighters in all stations within the Department. Gross authored a report recommending to Crider that Millspaugh be demoted because Millspaugh's assertion that five firetrucks were non-operational on May 2, 2019, was misleading and inaccurate. Gross also testified that after the May 2, 2019, meeting, Gross called Millspaugh into his office and asked him why he left the voicemail with Gambrill's office. Millspaugh did not respond, and that instance

was the only time in Gross's disciplinary investigation that Gross discussed the voicemail with Millspaugh.  On Millspaugh's annual review prepared in October 2019, Gross recommended changing Millspaugh's overall evaluation from exceeds expectations to meets expectations and including a note under the evaluation category for judgment and decision-making stating that Millspaugh was disciplined for contacting Gambrill's office without permission.

And the Defendants attached Graham's deposition.  On May 2, 2019, Graham and Millspaugh discussed concerns about firetrucks being out of service due to a lack of staffing, and Graham sent Millspaugh to another fire station to meet the minimum staffing requirements to keep a truck in service.  Graham did not recall discussing safety concerns with Millspaugh until after he learned of Millspaugh's voicemail to Gambrill's office.  He felt that Millspaugh undermined his authority by calling Gambrill's office instead of giving him a chance to address the staffing shortage.  Graham also testified that leading up to May 2, 2019, it was generally known that staffing was an ongoing problem, due to a change in overtime hiring practices requiring battalion chiefs to wait to hire overtime staff until the day before the needed shift.  Graham discussed the change with his direct superiors, expressing concern that the difficulty in staffing would affect the safety of Cobb County residents.  Graham prepared Millspaugh's performance evaluation in 2019.  Graham originally evaluated Millspaugh's overall performance as exceeds expectations but was instructed to decrease the

evaluation to meets expectations.  Graham disagreed with the decision to demote Millspaugh and believed a written reprimand was a more appropriate form of discipline.  He expressed his disagreement to his superiors, but Millspaugh was still demoted.

In response to the Defendants' motion for summary judgment, Millspaugh argued that his voicemail was not within the ordinary scope of his job's duties but merely concerned his ordinary duties.  Millspaugh asserted that he contacted Gambrill's office as an informed constituent to offer ideas on how to solve the staffing problems.  He also argued that the Individual Defendants were not entitled to qualified immunity because they knowingly violated his First Amendment rights.  In support, Millspaugh attached his own declaration, in which he stated that his goal in reaching out to Gambrill's office was to offer ideas on long-term compensation policies that could improve the retention of firefighters and alleviate staffing concerns.

In reply, the Defendants reasserted their argument that Millspaugh spoke as an employee when he left the voicemail with Gambrill's office.  The Defendants also maintained that Millspaugh's interest in the voicemail did not outweigh their interest in protecting the Department's ability to provide fire protection to Cobb County.  Finally, the Defendants reiterated their argument that the Individual Defendants were entitled to qualified immunity.

On October 5, 2021, the district court held a hearing on the motion for summary judgment. The Defendants argued that Millspaugh's call to Gambrill's office was directly related to his review of the status board, which was part of his official job responsibilities. The district court asked Millspaugh what role his declaration should play in the litigation, and Millspaugh argued that the declaration explained his motivation in leaving the voicemail with Gambrill's office. The district court stated that the declaration appeared to be self-serving because it was an after-the-fact explanation of his reasoning that was unavailable to the Defendants when they decided to demote him. The district court stated that the declaration was relevant to some matters, but the after-the-fact reasoning for leaving the voicemail was irrelevant in evaluating the Defendants' actions.

After the hearing, the district court granted summary judgment for the Defendants on all of Millspaugh's claims. The district court found that Millspaugh left the voicemail with Gambrill's office while on duty, shortly after discussing staffing issues with Graham, and in direct response to information he acquired while performing his job as a Firefighter III. Therefore, the voicemail involved the subject matter of his job duties and was not protected by the First Amendment. The district court also determined that the County's interest in the efficiency of the Department outweighed Millspaugh's interest in the speech. Trust is particularly important in providing effective emergency services to the public, and the voicemail undermined the trust Millspaugh's superiors had

in him.  Finally, the district court determined that the Individual Defendants were entitled to qualified immunity.  The district court concluded that because Millspaugh did not engage in constitutionally protected speech, he could not prove that the Individual Defendants violated his constitutional rights.

This appeal ensued.

## II.    STANDARDS OF REVIEW

We review the grant of summary judgment *de novo*. *Thomas v. Cooper Lighting Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  "Summary judgment is appropriate when 'there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).  Summary judgment may be affirmed if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993).  In addition, we review the grant of qualified immunity *de novo*. *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991).

## III.    ANALYSIS

On appeal, Millspaugh sets forth two overarching arguments for why the district court erred in granting summary judgment.  First, Millspaugh argues that his voicemail was protected by the First Amendment because he left the voicemail as a citizen, not an employee.  Second, he argues that the Individual Defendants were not entitled to qualified immunity because they violated his

clearly established First Amendment rights.  We address each argument in turn.

### A.  Millspaugh's Speech Was Not Protected by the First Amendment

Millspaugh argues the district court erred in determining that he left the voicemail as an employee, rather than a citizen, because it misapplied the framework set forth in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and its progeny.  He argues that the district court misapplied the five factors in determining whether a public employee is speaking as an employee or a citizen: "(1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies."  *Fernandez v. Sch. Bd. of Miami-Dade Cnty.*, 898 F.3d 1324, 1332 (11th Cir. 2018).

As to the first factor, Millspaugh argues that the district court erroneously relied on *Alves v. Board of Regents of the University System of Georgia*, 804 F.3d 1149 (11th Cir. 2015), because, unlike *Alves*, he contacted Gambrill's office not to complain about the workplace—specifically, the staffing shortages—but to ensure public safety.  He argues that the district court improperly construed facts in the Defendants' favor by concluding that the voicemail was offered pursuant to his job duties and improperly declined to consider his declaration as self-serving despite corroborating evidence indicating he left the voicemail out of concern for the safety of citizens.  As to the second factor, Millspaugh argues that he did not

use official channels or harness the Department's resources in contacting Gambrill's office. As to the third factor, Millspaugh argues that he did not present himself as a figure of authority or even represent that he was a firefighter. As to the fourth and fifth factors, he contends that he did not follow official directives or observe formal workplace hierarchies since he had no obligation to report non-operational vehicles to Gambrill.

Millspaugh also argues that the district court erred in finding that even if his speech were protected, the County's interest in efficiency outweighed his interest in that protected speech. He argues that the district court ignored the balancing requirement in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and effectively created an "absolute bar" against public safety employees from speaking outside the chain of command by allowing an assertion of loss of trust to outweigh the employee's speech interest. He also argues that the record does not reflect a disruption in the workplace or a loss of trust because (1) Graham disagreed with his demotion and rated him highly in his annual evaluation, (2) the issue of understaffing was already well known to the Defendants, and (3) Crider conceded that the voicemail did not disrupt the Department's service provision.

Relatedly, Millspaugh argues that the district court's *Pickering* analysis failed to appreciate the minimal weight that is typically assigned to a fire department's interest in efficiency. While paramilitary organizations generally have a strong interest in efficiency, Millspaugh cites several cases in which firefighters reporting public

safety concerns weighed heavily in the interest of the protected speech because few subjects are of greater concern to the average citizen than the provision of basic fire and rescue services. *See, e.g.*, *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554 (11th Cir. 1995); *Porter v. Califano*, 592 F.2d 770 (5th Cir. 1979); *Abad v. City of Marathon*, 472 F. Supp. 2d 1374 (S.D. Fla. 2007); *Rodin v. City of Coral Springs*, 229 F. App'x 849 (11th Cir. 2007). Millspaugh submits that a fire department's paramilitary status is relevant only in a few extreme situations that are not applicable here. Finally, Millspaugh argues that the Defendants' expert witnesses, who stated that firefighters should not go outside the chain of command unless there is a life-threatening situation, make it impossible for firefighters to engage in protected speech because life-threatening situations only arise in the scope of their duties.

In response, the Defendants argue that the district court correctly held that Millspaugh was speaking as an employee and not as a private citizen. They first argue that to determine whether an individual is speaking as an employee or a citizen, the Court must consider the "content, form, and context" of the speech. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015). Based on the content, context, and form of the voicemail, the Defendants argue, Millspaugh's speech owed its existence to, and was in furtherance of, his official job duties. Specifically, as to the voicemail's contents, the Defendants note that Millspaugh only mentioned the purported "not operational" status of five firetrucks on that particular day due to a perceived lack of staffing, which coincided with

his duty to report staffing concerns to Graham. While Millspaugh did not indicate that he was a firefighter in the voicemail, there was similarly no indication that he was speaking as a citizen. Next, the Defendants contend that Millspaugh's official duties in staffing various stations and monitoring the status board, which ordinary citizens cannot access in real time, led Millspaugh—who was on duty, in uniform, and at the fire station—to leave the voicemail. Thus, the context indicates that he left the voicemail as an employee. Finally, the Defendants assert that the form in which Millspaugh made the speech indicates he was speaking as an employee because he left a voicemail at Gambrill's office, instead of speaking to the broader public in a public forum.

The Defendants also argue that the motive behind Millspaugh's voicemail is irrelevant because courts generally consider the motive for one's speech only when determining whether the speech is a matter of public concern—not when determining whether the speaker is speaking as a citizen. They additionally argue that Millspaugh's decision to speak outside the chain of command does not weigh in favor of finding that he was speaking as a citizen, as his failure to follow instructions does not change the fact that the speech arose in the course of his job responsibilities.

The Defendants also argue that even if Millspaugh spoke as a citizen, the district court correctly concluded under *Pickering* that the County's interest in promoting the efficiency of public services outweighed Millspaugh's interest in his speech. They argue

that this Court must consider the Department's status as a paramilitary organization and give deference to the state's heightened interest in regulating the conduct of employees and that the cases that Millspaugh relies on are inapposite. Finally, the Defendants argue that the record reflects that Millspaugh's superiors lost trust in him because of the voicemail, causing a disruption within the Department. They note that Millspaugh's superiors were pulled from other job responsibilities to handle the situation caused by Millspaugh's voicemail and that Millspaugh himself acknowledged the potential harm of deviating from the chain of command.

Millspaugh's arguments are unavailing. State actors may be held liable for depriving persons of any rights secured by the Constitution. 42 U.S.C. § 1983. A § 1983 First Amendment retaliation claim requires a four-part analysis. *Moss*, 782 F.3d at 617–18. First, we determine whether the plaintiff's speech "was made as a citizen and whether it implicated 'a matter of public concern.'" *Id.* (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013)). Second, if the plaintiff's speech was made as a citizen and implicated a matter of public concern, then we weigh the plaintiff's interests in free speech against the government's interest in regulating speech "to promote 'the efficiency of the public services it performs through its employees.'" *Id.* at 618 (quoting *Carter*, 731 F.3d at 1168–69). These first two inquiries inform whether the plaintiff's speech is protected speech under the First Amendment. *Id.* Third, if the plaintiff's speech is protected speech, the plaintiff must show that his speech was a "substantial motivating factor" in

the alleged adverse employment action. *Id.* Finally, if the plaintiff makes this showing, then the burden shifts to the government to prove that it would have performed the adverse action even in the absence of the plaintiff's speech. *Id.*

The first part of the four-part analysis requires that the employee meet two elements: (1) that he spoke as a citizen and (2) that the speech addressed matters of public concern. *Boyce v. Andrew*, 510 F.3d 1333, 1342–43 (11th Cir. 2007). If the plaintiff cannot make this showing, then there can be no First Amendment issue, and the constitutional inquiry ends. *Id.* at 1343. These two elements are questions of law that the district court must decide. *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007).

Generally, whether a plaintiff speaks as a citizen depends on whether the speech itself is ordinarily within the scope of an employee's duties, not whether it merely concerns those duties. *Lane v. Franks*, 573 U.S. 228, 240 (2014). Speech made pursuant to an employee's job duties is not speech made as a citizen and is, therefore, not protected by the First Amendment. *Moss*, 782 F.3d at 618; *see also Boyce*, 510 F.3d at 1342 (explaining that where public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes). There is no comprehensive framework for this analysis; rather, courts must inquire into whether, as a practical matter, the speech "owes its existence" to the employee's professional responsibilities. *Moss*, 782 F.3d at 618 (quoting *Garcetti*, 547 U.S. at 421). Relevant, but nondispositive, factors include: "the employee's job description,

whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Id.* Formal job descriptions do not control the inquiry because they may bear little resemblance to the duties an employee is actually expected to perform, and employers may craft broad descriptions to restrict the rights of employees under the First Amendment. *Garcetti*, 547 U.S. at 424–25. Instead, "we look to the 'content, form, and context of a given statement, as revealed by the whole record.'" *Vila*, 484 F.3d at 1340 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

Additionally, to determine "whether the purpose of the employee's speech was to raise issues of public concern or to further her own private interest, . . . '[w]e ask whether the main thrust of the speech in question is essentially public in nature or private." *Alves*, 804 F.3d at 1162 (quoting *Vila*, 484 F.3d at 1340); *accord Boyce*, 510 F.3d at 1344; *see also, e.g.*, *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1285–86 (11th Cir. 2006) ("Thus, if [the plaintiff's] speech, when context, form and motivation are weighed, truly did act as a satire or parody, and the point of that satire or parody was to express a viewpoint in the Public Access debate, the speech could touch on a matter of public concern.").

If we determine that the plaintiff spoke as a citizen and on a matter of public concern, we then weigh the plaintiff's interest in his speech against the defendant's interest in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568. In making this determination, we consider the "manner, time, and place" of the speech, as well as the context in which it arose. *Moss*, 782 F.3d at 621 (quoting *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1138, 1346 (11th Cir. 2013)). Other relevant factors include whether the statement "impairs discipline by superiors or harmony amongst co-workers, has a detrimental impact on close working relationships for which loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (quoting *Leslie*, 720 F.3d at 1346). The government's interest in avoiding disruption does not require proof of actual disruption, and proof of a reasonable possibility of adverse harm is sufficient. *Id.* at 622. In applying the *Pickering* test, we consider the special concerns inherent to managing paramilitary organizations, such as fire departments or police departments. *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000); *Moss*, 782 F.3d at 621.

In this case, it is undisputed that Millspaugh's speech addressed matters of public concern. Indeed, Millspaugh's voicemail concerned the staffing and availability of fire suppression services, which are important issues for the safety of the community, and therefore, matters of public concern.

We thus must determine whether Millspaugh spoke as a citizen or an employee. And, in analyzing the content, form, and context of his speech as revealed by the whole record, we conclude that Millspaugh spoke pursuant to his official duties and his speech

owes its existence to his official responsibilities.  We proceed by tracking Millspaugh's arguments based on the factors set forth in *Fernandez*.  *See* 898 F.3d at 1332.

As for the first *Fernandez* factor of whether Millspaugh was speaking with the objective of advancing his official duties, *id.*, it is undisputed that ensuring adequate staffing within his battalion was squarely within Millspaugh's job responsibilities and that he often had conversations with Graham about finding adequate staff to keep their vehicles in operation.  Millspaugh's job duties also included receiving calls from firefighters who were missing a shift and calling other firefighters to work overtime to cover missed shifts.  His voicemail, in which he stated, "[h]ey, Ryan, this is Scott . . . I was wanting to know if you guys knew why there was five fire trucks not operational today in [Political] District One[,]" sought to advance his professional responsibilities of securing more staff to operate firetrucks.  Millspaugh's attempt to draw a distinction between his day-to-day responsibility in assigning staff to firetrucks and his voicemail purportedly seeking to address a public safety crisis is unpersuasive given the content of the voicemail itself.  He plainly did not reference any staffing shortages beyond that particular day, broader public safety concerns, or other policy issues.  We therefore conclude this factor weighs against Millspaugh speaking as a citizen.

As to the second factor of whether Millspaugh harnessed workplace resources, *id.*, Millspaugh's uncontested testimony re-

veals that before leaving the voicemail, he harnessed the Department's resources by reviewing the status board, which is unavailable to ordinary citizens.  And we find Millspaugh's argument that his use of the status board does not amount to a harnessing of workplace resources because he only used workplace resources to inform, not communicate, unpersuasive.  As to the third factor of whether Millspaugh projected official authority, *id.*, while Millspaugh is correct in that he did not present himself as a figure of authority, it is also evident that he did not state that he was a citizen, and he conveyed information to which only a firefighter would have access.  We thus conclude that the second and third factors weigh against Millspaugh speaking as a citizen.

Finally, while the fourth and fifth *Fernandez* factors may weigh in favor of Millspaugh because he did not follow official directives or observe formal workplace hierarchies, *see id.*, we conclude they do not overcome the first three factors, which indicate that, as a practical matter, Millspaugh's voicemail owes its existence to his professional responsibilities.  *Cf. Alves*, 804 F.3d at 1163 (holding that plaintiffs expressing their concerns to persons "well outside" their chain of command did not mean that they were speaking as citizens rather than employees).  We also note that Millspaugh testified that he left the voicemail while he was on duty, at the fire station, and in direct response to checking the status board to see which vehicles were in service.  While none of these

factors are dispositive, the factors ultimately weigh in favor of finding that Millspaugh was not speaking as a citizen but as an employee. *See Moss*, 782 F.3d at 618.

Further, Millspaugh's argument that the Defendants' focus on the content, form, and context of the speech must be analyzed "as revealed by the whole record," while correct, does not advance his case. *Vila*, 484 F.3d at 1340. Viewing the record as a whole, the content, form, and context of the voicemail reveal that Millspaugh was speaking as an employee, not a citizen. Chronic staff shortages reflected in the record buttress the finding that the content of the voicemail was to further Millspaugh's official duties in securing staffing for his battalion. Viewing the record as a whole, the context of the voicemail also indicates that Millspaugh was speaking as a public employee: Millspaugh was at the fire station, in uniform, and on duty when he left the voicemail. The form of the speech also supports the finding that Millspaugh spoke as an employee since he left a voicemail for Gambrill's office and did not speak to the broader public in a public forum. Millspaugh provides no legal support for his contention that his form of speech indicates that he was speaking as a citizen because Gambrill *could have* made his voicemail public.

Millspaugh argues that we should consider his declaration and contemporaneous explanation for the voicemail on May 2, 2019, but we disagree. As a preliminary matter, the Defendants argue that motive is relevant only in determining whether the

speech is a matter of public concern. While we have examined motive to determine whether the speech in question is a matter of public concern, the Defendants' cited cases do not establish that motive is relevant *only* in determining public concern. *See Alves*, 804 F.3d at 1162; *Boyce*, 510 F.3d at 1344; *Mitchell*, 468 F.3d at 1285–86. Rather, as Millspaugh rightly argues, we have considered motive in determining whether the speech was made as a citizen or employee. *See Moss*, 782 F.3d at 619 (considering the plaintiff's testimony regarding motive in determining whether the plaintiff spoke as an employee or citizen). Motive is thus relevant for both inquiries.

Nonetheless, Millspaugh's reliance on his declaration and his contemporaneous explanation is misplaced. First, the district court correctly determined that his declaration was immaterial because it was an after-the-fact explanation of his reasoning that was unavailable to the Defendants at the time. Second, Millspaugh's contemporaneous explanation for the voicemail on May 2, 2019, indicates that the purpose of the voicemail was, at least in part, to ensure "adequate coverage in District 1" by increasing staffing. Further, Millspaugh repeatedly testified that he left the voicemail because of understaffing. As noted above, securing additional staffing directly furthered Millspaugh's duties in overseeing staffing on a day-to-day basis and ensuring sufficient staffing for his battalion. Thus, Millspaugh's own contemporaneous explanation indicates that his voicemail was intended to advance his official duties.

Accordingly, the district court did not err in determining that Millspaugh's voicemail arose within the scope of his professional responsibilities and was not protected by the First Amendment. Because the district court did not err, this Court need not consider whether the Defendants' interest in promoting efficiency in providing fire suppression services outweighs Millspaugh's interest in the speech. *See Boyce*, 510 F.3d at 1343 ("If the government employee, however, was speaking as an employee, then there can be no First Amendment issue, and the constitutional inquiry ends with no consideration of the *Pickering* test.").

But even if Millspaugh's voicemail were protected speech under the First Amendment, the district court correctly determined that the Defendants' interest in promoting the efficiency of fire suppression services outweighed Millspaugh's interest in the speech. *See Pickering*, 391 U.S. at 568. As an initial matter, while Millspaugh relies on several cases to argue that we should not give deference to the fact that the Department is a paramilitary organization with a heightened interest in regulating employees, we do not find these cases instructive. First, in *Beckwith*, 58 F.3d at 1564, the question of whether the plaintiff's speech was protected was not disputed, and we have since held that the part of the *Beckwith* holding that Millspaugh relies on is dicta, *see Anderson v. Burke County*, 239 F.3d 1216, 1220 (11th Cir. 2001). Second, Millspaugh's reliance on *Porter*, 592 F.2d 770, is unpersuasive as *Porter* did not involve a paramilitary organization. Third, *Abad*, 472 F. Supp. 2d 1374, is a non-binding district court decision in which the district

court relied on the aforementioned dicta in *Beckwith*. Finally, *Rodin*, 229 F. App'x 849, is inapposite because the unpublished opinion concerned the issue of whether the speech was of public concern, not whether the speaker was speaking as an employee or citizen. Meanwhile, we have consistently held that fire departments are paramilitary organizations with a heightened interest in regulating the conduct of employees. *Moss*, 782 F.3d at 621; *Anderson*, 239 F.3d at 1222. Further, in *Moss*, we recognized the heightened interest of the fire department even though the case did not involve an extreme situation, thereby establishing that the heightened interest that fire departments have as a paramilitary organization is not limited to extreme situations as Millspaugh argues. *Moss*, 782 F.3d at 616.

With this heightened interest in mind, we find that the undisputed testimonies of several individuals establish that Millspaugh's voicemail damaged his superiors' trust in him and thereby undermined the Department's heightened interest in promoting the efficiency of fire suppression services. Crider testified that Millspaugh's voicemail violated his trust, and Graham testified that he felt undermined by Millspaugh's conduct. Millspaugh himself testified that fire departments rely on trust among employees when providing emergency services to the public. Millspaugh also admitted that breaking the chain of command could cause issues between a firefighter and his superiors. Given such undisputed testimony, even after viewing the evidence in the light most favorable

to Millspaugh, the record reflects that there was at least a reasonable possibility of adverse harm to Millspaugh's working relationships with his superiors to tilt the *Pickering* analysis in the Defendants' favor. *See Moss*, 782 F.3d at 622 (holding that proof of a reasonable possibility of adverse harm is sufficient).

Accordingly, Millspaugh's speech was not protected by the First Amendment.

## B. Crider and Gross Were Entitled to Qualified Immunity

Millspaugh further argues that the district court erred in granting qualified immunity to the Individual Defendants because he engaged in speech that was protected by the First Amendment. He claims that the law is clearly established that he is entitled to First Amendment protections, the Individual Defendants did not articulate any risk to the efficiency of their operations, and the Individual Defendants knowingly violated the First Amendment by retaliating against him. In response, the Defendants argue that Millspaugh's First Amendment rights were not violated for the reasons discussed above and that even if there were a First Amendment violation, the specific right was not clearly established.

We review the grant of qualified immunity *de novo*. *Courson*, 939 F.2d at 1486. Qualified immunity is an affirmative defense that entitles a government actor not to stand trial or face the burdens of litigation in civil damages suits when he was engaged in discretionary conduct that did not violate clearly established statutory or constitutional rights that a reasonable person

would have known. *Koch v. Rugg*, 221 F.3d 1283, 1294 (11th Cir. 2000). To be entitled to qualified immunity, the defendant must establish that "he was acting within the scope of his discretionary authority." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). Once this threshold inquiry is met, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. *Id.* The plaintiff must show that: (1) the defendant violated his constitutional rights, and (2) that, at the time of the violation, those rights were clearly established. *Id.*

Millspaugh's arguments are unavailing. As Millspaugh concedes, qualified immunity turns on whether Millspaugh's voicemail is protected by the First Amendment. For the reasons stated above, we find that Millspaugh's voicemail was not protected by the First Amendment. And because Millspaugh's voicemail was not protected by the First Amendment, he fails to meet his burden of proving that the Individual Defendants violated any constitutional rights. *See id.* Accordingly, the district court did not err in determining that the Individual Defendants were entitled to qualified immunity, and we need not proceed further.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's order.

**AFFIRMED.**